| 8 | 257 |
|---|---|
| 175 | 4723 |

## McNAIR AND OTHERS *vs.* BIDDLE AND OTHERS.

1. If a judgment is void, advantage may be taken of it in any collateral proceeding; but if the court has jurisdiction over the subject-matter, and the party defendant has notice of the proceedings against him, he is bound thereby, however irregular or erroneous the proceedings, and the judgment is binding and conclusive on all parties and privies thereto, in any collateral proceeding, unless it has been vacated for irregularity or reversed for error; and rights and titles acquired by virtue of an execution issued on such judgment will be protected.

2. Although it may not appear from the proceedings in a cause that process has been served on a party, yet if he appear by attorney and file a plea, &c., he will be considered as having personal notice. The object of a summons is to procure the attendance of a party, and so that is effected, it matters not whether the summons is served or not.

3. A mortgagee may become the purchaser of the equity of redemption directly from the mortgagor, or may purchase the property under a decree of foreclosure and sale.
   The mortgagee has never been considered within the rule which forbids trustees and those having a fiduciary, or confidential, character from purchasing estates with whose disposition they have been entrusted.

4. The rule in chancery, that under the prayer for general relief a party may have any relief to which he is entitled, is to be understood, that the relief granted is to be founded on the facts stated in the bill, and not such as may be proved at the hearing.

## APPEAL from St. Louis Court of Common Pleas.

LAWLESS *and* NABB, *for Appellants*, submit the following general points:—

1. The decree of foreclosure, and all the proceedings under it, are void, being *coram non judice*.

2. After the execution, and before the foreclosure of the mortgage dated 22d March, 1819, no arrangement or agreement touching the equity of redemption, in any way impairing or affecting the right of redemption in the mortgagors, A. W. McNair and M. S. McNair, is valid; for, until the relation of mortgagor and mortgagee be dissolved, which must appear from the showing of the mortgagee by the most undoubted and satisfactory evidence, in equity the parties are incapable of any contract as to the redemption, from the policy of the law.

3. Where the statute prescribes a mode of foreclosing mortgages, it is against the policy of the law and equity for any sale to be made by any arrangement of

*McNair and Others vs. Biddle and Others.*

the parties, but the same must be in pursuance of the strict requisitions of the statute.

4. Admitting, quoad A. McNair, the sale to be effectual, as made to divest title out of him, M. S. McNair, being a femme covert in 1805, co-mortgagor and co-obligor in 1819, after the seizin of her husband, and party defendant in 1823, and widow in 1826, her right of redemption survives to him, she not having consented or being privy to any arrangement.

5. The certificate of acknowledgment in the deed of 22d March, 1819, conveying the two by forty arpens near St. Louis, is not sufficient to divest her of her estate in the premises.

6. The sale of 4th October, 1824, was made under circumstances of fraud.


SPALDING, *for Appellees.*

POINTS AND AUTHORITIES FOR APPELLEES.

I. The foreclosure, and sale therein, to John Mullanphy, of the two by forty arpents, passed the legal title to him.

1. The decree was sufficient to support the sale, so far as regards Alexander McNair.—1 Edwards' Compilation, 182; *Ibid.*, 847, sec. 26, 36; Geyer's Digest, 308, act relating to mortgages; *Ibid.*, 242, 3, &c., acts regulating judicial proceedings, &c.; Acts of Assembly of November, 1821, p. 76; an act regulating proceedings at law; 1 Mo. Rep., 240, that proceeding is on common law side.

2. And there is no irregularity as to him, making the sale void.—10 Pet. Rep., 472, Voorhees *vs.* Bank; 4 Dana Rep., 429; 8 Cow. Rep., 361, Cunningham *vs.* Gallatin; (this case cited by Nabb to show invalidity of decree: it does not show or sustain any doctrine to that effect.)

3. The decree is also valid against the wife.—10 Peters' Rep., 472; Storey's Equity Pleading, 72, sec. 71, and p. 670, sec. 873 — that appearance of wife must be by next friend, if she does not join her husband's answer; 5 Cow. Dig., 572; 2 Tidd's Practice, 1056 — appearance of infant by attorney is error.

The decree is entitled in the case of Mullanphy *vs.* A. McNair and Margaret S. McNair, saying that the parties came, &c.

4. Complainants cannot question the passing of the title, as their own bill alleges it, and goes upon the supposition that both the mortgage and the sheriff's deed operated.—9 Pet. Rep., 405; 2 Miss. Rep., 210.

5. Even supposing the decree not binding upon the widow, it cannot affect the title, as she had no dower; *first*, because she released it in joining with her husband in the mortgage; and, *second*, because the statutes then in force allowed her no dower.—1 Edwards' Compilation, 178, 418; Geyer's Digest, 175; 13 Johns. Rep., 109, 111; 4 Leigh's Rep., 498; 1 Edwards' Compilation, 129, 399, 509; Acts of Territorial Legislature of session of 1814, p. 118, sec. 9, and p. 157, sec. 72; *Ibid.* of 1816, 17, p. 47, 48, 49, secs. 1–4.

The acts show that there was no dower in land conveyed away by husband in his life-time, or, if there was, that it was divested by the sale and foreclosure.

6. A public sale of land at auction, by order of court in an execution, is not, of

course, void because of a private understanding between the debtor and creditor.
—1 Sugden on Vendors, 131, 323, 324, 333; 3 Mad. Rep., 232.

Nabb cites 1 Sugden, 333, which relates to sales of reversions only.

II.   There is no equity to induce the court to divest the legal title.

1.  There is no equity arising from the circumstances of the sale.

2.  Nor in the fact, that it was tied in with an understanding with McNair, that Mullanphy should allow him a larger sum than it would bring at sheriff's sale.

3.  Nor in the agreement itself, which is given in evidence for the purpose of rebutting the alleged equity, and showing that McNair was not wronged, and not because it is necessary to prove any agreement binding in law.

4.  But the agreement was binding according to law, and would not have been affected by the statute of frauds.—1 Sugden on Vendors, 133–5; 2 Miss. Rep., 126, 135.

5.  Had there been no agreement or understanding, the property would not have brought $6,000 at the sheriff's sale.— See O'Fallon's testimony; the conclusion of Dent's deposition; Jesse G. Lindell's testimony, &c.

6.  There was no plan to defraud on the part of Mullanphy.

7.  Nor was there any oppression.

8.  There is nothing in the relation of mortgagor to mortgagee to prevent the sale of the equity of redemption to the latter by the former.—2 Sugden on Vendors, 127; 2 Sch. and Lefroy, 672; 3 Powell on Mort., 1154 (*a*); 1 Powell, 122, 127 (*a*).

9.  The contract, if we are bound to defend it as a contract, was not rescinded, because Mullanphy did not formally give the credit.

III.   The lapse of time is a sufficient reason why the court will not interfere.— Revised Code, 470, sec. 5; 2 Sch. and Lefroy, 671, 672; 1 Sumner's Rep., 115, 116; 4 Dana's Rep., 429; 1 Caine's Cases in Error, p. 17.

IV.   Mrs. McNair has no right to redeem, in consequence of the proviso in the mortgage; because if she had a right of dower, then the right of redemption in mortgage is only a recognition of that right.  If she had no right of dower, then her right to redeem is without consideration, and therefore continued only till the money fell due.

Mrs. McNair has no right in the property on the grounds of the Spanish law, as there was no community; for the community had been repealed.— See the several acts of the legislative authority, giving dower to the wife, which is in lieu of her interest under the Spanish law, in what is called the community.

A husband and wife, marrying in Spain, where the laws provide a community of interest, *a partnership*, between husband and wife, and then removing here, to Missouri, do not bring with them the law of Spain; but if they acquire lands, the wife's interest will be governed by the law of Missouri; and in all such cases, the wife's interest in lands acquired depends entirely on the law of the country to which they remove, and where they acquired land.— Storey's Conflict of Laws.

Exactly on the same principles, Mrs. McNair obtained only such interest in land as the law gave her, which was in existence at the time of the acquisition of the land.

Furthermore, the bill does not set out her title by *community*.

V. If McNair and his heirs are barred by the sale, and Mrs. McNair only has a right to redeem, then there are too many complainants, and there can be no decree for complainants.— Calvert on Parties, 77, which is in 15 Law Lib., 46; Storey's Equity Pleadings, 199.

Scott, *Judge, delivered the opinion of the Court.*

This was a bill in chancery, filed by the heirs of Alexander McNair, deceased, and Margaret S. McNair, widow and administratrix of said Alexander McNair, against Ann Biddle and others; in which it was alleged, that Alexander McNair departed this life on the 18th of March, 1826, leaving the said widow and heirs; that he was seized, during his life-time, of considerable real estate in the county and city of St. Louis, and in the counties of St. Charles, Washington, Jefferson, and others, in the State of Missouri:

That McNair, becoming indebted to J. Mullanphy, deceased, formerly of St. Louis, in the sum of $4,000, together with his wife, mortgaged to said Mullanphy, to secure the said sum, a lot of ground, two arpens in front and forty deep, being the same conveyed to McNair by Pierre Chouteau, by deed bearing date 13th September, 1808, and which is the subject of this controversy. The mortgage was executed on the 22d March, 1819, and was to become absolute in one year, unless the mortgage debt was paid. During the years 1820 and 1821, McNair, to secure the payment of other debts to Mullanphy, amounting to $10,251, bearing ten per cent interest, mortgaged all the other real estate which he possessed. On one of these mortgage debts suit was brought and judgment obtained, and the equity of redemption of all the property included in the mortgages last mentioned was sold under execution on the 6th of October, 1824, and Mullanphy became the purchaser, with the exception of one lot in St. Louis. Mullanphy, by threats and efforts to intimidate, obtained the said property at a great sacrifice. A petition to foreclose the equity of redemption in the two by forty arpent tract, described in the first mortgage, and the subject of this suit, was filed by Mullanphy, and judgment was obtained against McNair, and the property ordered to be sold on the 4th of October, 1824. The tract was sold, and Mullanphy became the purchaser for $1000, receiving a deed for the same, dated 18th of October, 1824. The bill then alleges, that the said tract of land, at the time of sale, was worth $20,000, the house thereon had cost $5,800, and there were other improvements of great value. It is then charged, that Mullanphy succeeded in obtaining said lot by direct misrepresentation and delusive promises, practised upon and made to said McNair and his wife. At the sale, Mullanphy prevented all competition, by giving it to be understood that the subsequent mortgages above mentioned were incumbrances on the two by forty arpent tract; that he was, in fact, the purchaser for the benefit and as the friend of McNair and family, and did impress on the minds of the said McNair and wife, that he would hold the said tract for their benefit, and either would re-convey it, or allow for it a large credit. Such was the confidence reposed by McNair in Mullanphy, and so assured was

he of Mullanphy's friendship, that he, in the month of ——, 1823, long previous to said sale, surrendered possession of the tract of land on which McNair then resided to Mullanphy, who placed thereon Ann Biddle and her husband, Thomas Biddle. The balance of the debt secured by the said mortgage on the lot remains unpaid, amounting to upwards of $7,000. Mullanphy, in 1829, conveyed the said land to William Clarke for life, with remainder in fee to Bryan Mullanphy, in trust to the sole use of Ann Biddle. Ann Biddle has been in possession of the lot since 1823. Mullanphy died 18th September, 1833, having previously appointed John O'Fallon his executor, who has taken upon himself the burden of administering the same.

The bill prays for an account, and to be let in to redeem, and that the sheriff's deed may be ordered to be delivered up to be cancelled. The judge of the Circuit Court being a party to the suit, it was sent to the Court of Common Pleas for trial.

Ann Biddle, in her answer, stated, that she knew nothing of the indebtedness of McNair to her father, save that she had heard her father say, that he was afraid he had loaned more money to McNair than he could be able to recover, and more than all his property was worth. She had no knowledge of the title of Mullanphy to the lot whose redemption is sought by the complainant's bill, until the same was filed; nor did she know that the same had ever been mortgaged, more than that she had an impression the lot had been acquired by her father from McNair, on account of his failure to repay money loaned to him. She admits, the lot was mortgaged by McNair and wife about the time mentioned in the bill, and the same was duly foreclosed, and a decree of foreclosure was entered July 2d, 1824, on which an execution issued for $6,111 11, under which a sale was made of the lot to Mullanphy, for which he received a deed from the sheriff:

That Mullanphy did not purchase said lot for the benefit of McNair and his family. She believes an arrangement was made between Mullanphy and McNair, whereby Mullanphy was to have the lot, and accordingly Mullanphy bought in with the approbation of McNair, and the said lot was Mullanphy's, not only by the sale aforesaid, but with the knowledge and consent of McNair. She denies any improper influence was exerted by Mullanphy, or misrepresentations made by him, by which competition at the sale was prevented, or the sale in any way affected to the prejudice of McNair. Nor were any representations made by Mullanphy, which induced McNair or his friends to believe that Mullanphy was purchasing the lot for McNair's benefit; nor was there ever the least encouragement held out to McNair or his wife that the lot was purchased for their benefit; but on the contrary, it was purchased with a full knowledge on the part of McNair that it was for the benefit of Mullanphy, and without the least expectation in McNair of a right to redemption. She knows of no agreement between Mullanphy and McNair as to allowing a credit for the same, and if there was such an understanding, it must have been that such a credit should be allowed at a settlement, which has never taken place to her knowledge.

Since the sale, no attempt has been made to collect the balance of the debt secured by mortgage on the lot in dispute. The lot was not worth more, at the

time of sale, than the mortgage debt, which was between six and seven thousand dollars. It is true, that McNair, some time in November, 1823, did surrender to Mullanphy the lot, and thereupon he put her and her husband in possession of the same, which had been promised to her by her father; that McNair gave up the possession to her father under an agreement to purchase, and did not put him in possession as mortgagee; and had it even been so, yet the rents and profits, between the delivery of possession and the sale under the decree of foreclosure, amounted to an inconsiderable sum.

That McNair was fully aware of the purpose for which possession was given to her and her husband, and that it was fair and just, and without the least hope of redemption; that her father, some time in 1824, conveyed the lot in trust for her sole and separate use, as she had then recently married; and that afterwards, it being desirable to modify the trust for the benefit of her husband, Thomas Biddle, the deed of trust, which had never been recorded, was suppressed, and another, modifying the former, was executed in October, 1829, as stated in the bill. She denies the right of redemption, and insists on the *length of time,* as throwing a cloud on the justice of the demand.

The answer of O'Fallon sustains that of Mrs. Biddle, and states some additional facts, which will be noticed. He heard, about the time of the sale, both Mullanphy and McNair, according to his best recollection, say, that it was agreed between them that Mullanphy should take the lot at $6,000, or thereabouts, and in pursuance of this arrangement, McNair removed from the property on which he had resided, and gave up the same to Mullanphy, who placed thereon Ann Biddle and her husband.

That the lot, with all its improvements, at the time of sale, was not worth more than $6,000, if so much, and he doubts if a person could be found who would have given that price for it; that Mullanphy never kept any books, so far as he knows or believes, in which his transactions were entered, except a little memorandum book, in which nothing is found in relation to his dealings with McNair.

That the agreement above stated having been made, he is willing to cancel the bond for the debt secured by the mortgage. He believes McNair was never credited by Mullanphy for the rent of the lot from the time possession was taken by Thomas Biddle till the sale, because said possession was delivered by McNair in compliance with the agreement between McNair and Mullanphy, above mentioned, which he believes was carried into effect by the sheriff's sale and deed, under the decree of foreclosure. He considers the balance of the mortgage debt satisfied. He is positive he heard McNair say, that, by an agreement between him and Mullanphy, the said lot was to have been the property of Mullanphy for $6,000, or thereabouts.

The answer of Bryan Mullanphy is a formal one.

Replications were filed, and the cause set for hearing. On the hearing, the mortgage on the lot in dispute, and the proceedings thereon to foreclose the same, were given in evidence; also, the sheriff's deed, and all the other mortgages and records referred to in the pleadings in the cause. It was proved, that McNair

McNair and Others vs. Biddle and Others.

and his wife were married in 1805. Frederick Dent, a witness, considered the lot worth $10,000. In 1816 or '17, it might have been worth three times that amount. On the morning of the day on which the sale of the lot took place, he met McNair at the court-house. McNair was in a great rage with Mullanphy, and said if he came there he would whip him; he dissuaded McNair from such a course of conduct; advised him to have an interview with Mullanphy. Just about that time Mullanphy came up, and he and McNair retiring, had some conversation; after which, McNair returned to the witness, expressed his gratitude for his advice, and observed, that Mullanphy intended to do him justice; he understood McNair to say, Mullanphy was to give him $4,000 above what was bid for the lot. In a conversation some weeks afterwards with McNair, he was informed by him that he had misapprehended him, that he was to have $6,000 for the property, and that he surrendered possession on those terms. The lot was worth $450 rent in 1823. He thought the arrangement McNair made with Mullanphy a very good one.

Robert Rankin testified, he was not present at the sale of the lot; that property had greatly depreciated in value at the time of the sale.

Beriah Cleland was present at the sale of the lot in dispute. Robert Rankin was present, and bid for the property. Witness inquired of Mullanphy, just before the lot was knocked down at $1,000, whether McNair would thus suffer his property to be sacrificed. Mullanphy answered, he did not believe McNair's friends would bid, as there was an understanding between McNair and himself. This conversation was in so low a tone of voice as nobody but Mullanphy could hear it.

The complainants gave in evidence, a letter from McNair to Major Biddle, of which the following is a copy:—

"St. Louis, 13th October, 1823.

"Major Biddle:—

"Dear sir,—You have made a proposition to me, as authorized by Mr. Mullanphy, to take the property I live on, which exceed to, the possession of which I would like to retain for one month. "Your friend,

"A. McNair."

"Major Biddle, Present."

Much other evidence was introduced about the value of the lot, and the cost of the improvements thereon. The improvements were supposed to have cost $6,000. The property was estimated variously, at from $6,000 to $20,000; McNair himself thought it worth $15,000. A great deal of evidence was given in relation to the unprecedented depreciation of the value of all property in the years 1822, '3 '4 '5. In 1816, '17, '18, and '19 there had been great speculation in real estate. Property of all kinds afterwards fell very much in price, and great distress prevailed in the community, which was greatly aggravated in St. Louis in consequence of the failure of the Bank of Missouri.

A decree was entered, dismissing the bill, from which the complainants have appealled to this Court.

It was urged by the complainants, that the judgment or decree of foreclosure

under which the lot was sold was void, and consequently, no title passed to Mullanphy by virtue of the sheriff's deed. It must be conceded, that no title passes under, or by virtue of, an execution issued on a void judgment; and if a judgment is void, advantage can be taken of it in any collateral proceeding; but it is equally clear, that if a court of record has jurisdiction of the subject-matter, and the party defendant has notice of the proceedings against him, he is bound by them, however irregular or erroneous they may be; and until direct proceedings are had on the judgment itself, to vacate it for irregularity, or to reverse it for error, it is binding and conclusive on all parties and privies thereto, in any collateral proceeding; and rights and titles acquired by virtue of an execution issued on such judgment will be protected by all courts.

This is a principle of our jurisprudence which has been steadily maintained, from a deep conviction of the mischiefs which would ensue from the least relaxation of it. If, after a court of competent jurisdiction has pronounced its judgment against a party who has notice of the proceeding, he were permitted, on another action, to call the justice or propriety of that judgment in question, there would be no end to litigation, and a law-suit would be interminable; and if it were a principle, that the title acquired at judicial sales would be valid only in the event that the judgment or decree on which process issued, by virtue of which the sale was made, was such that it could not be vacated for irregularity, or reversed for error, prudent men would be driven from such sales, a purchase at every such auction would be hazardous speculation, property would be sacrificed, and courts of justice brought into odium and disrepute, as the authors of a legalized system of gambling with the property of their suitors. The case of Voorhees *vs.* The Bank of the United States, (10 Peters, 472,) is an instance of the great length to which this principle has been carried by the Supreme Court of the United States.

Property was sold under the foreign attachment laws of the State of Ohio, and the court held the title to the purchaser passed by the sale, although it appeared the creditors were not to sell until twelve months, and it did not appear when the sale was made. In the case of Jackson *vs.* Bartlett, (8 Johns. Rep.,) the court held, the question of the regularity of the execution could not be raised in a collateral proceeding; though an execution may have issued after a year and a day from the rendition of a judgment, without revival by *scire facias*, it was only voidable at the instance of the party against whom it issued. A purchaser's title under such an execution was not to be questioned: it was a good authority for the sale. So, in the case of Parker's Heirs *vs.* Anderson's Heirs, (5 Monroe, 452,) it was held, that if a judgment or decree was reversed, the purchase of the plaintiff would not be affected more than that of a stranger.

The case of Gallatin *vs.* Cunningham, (8 Cowen, 361,) although it contains a remark of a single member of the court favoring the views of the complainants, yet the sale was, in that case, declared void and set aside, because a guardian had purchased the estate of his ward without the permission of the court.

Is there anything in the proceedings to foreclose the equity of redemption of the lot in dispute, which would induce a court to hold the judgment void? so far as A. McNair is concerned, it is doubted whether the judgment could be reversed

for error.   There is no pretence that the court had not jurisdiction of the subject matter; and although it does not appear that process was served on McNair, yet he appeared by his attorneys and entered his plea, on which issue was taken, which was submitted to the court for trial, and found against him.   The object of a summons is to procure the attendance of a party, and so that is effected it matters not whether it is served or not.   As to the objection that there was no answer filed, and this was a proceeding in chancery, it may be answered that this Court, in the case of Carr *vs*. Holbrook, 1 Mo. Rep., 240, held that proceedings to foreclose the equity of redemption, in a mortgage under the statute, are proceedings at common law, and not governed by rules in chancery.   In speaking of the validity of these proceedings, so far as they affected McNair, we do not wish to be understood as expressing any opinion as to their force and effect against Mrs. McNair.   For the present, we confine ourselves to the case in the bill made by the heirs and representatives of McNair.   If, then, the court had jurisdiction of the subject-matter, and if McNair had notice of the proceedings against him, which is apparent from the record, then it will follow, from the principle above stated, that a title to the lot passed by the sheriff's sale and deed to Mullanphy. If, then, the title passed, it will next be necessary to inquire whether there is any thing stated in the bill or proved at the hearing, or if the relation of mortgagor and mortgagee is of a character that will induce a court of equity to permit the parties to redeem?   Is there anything in the relation of mortgagor and mortgagee which prohibits the purchase of the equity of redemption by the mortgagee?   The mortgagee has never been considered within the rule which forbids trustees and those having a fiduciary or confidential character from purchasing estates with whose disposal they have been entrusted; nor is a contract between mortgagor and mortgagee, for the purchase of the equity of redemption, within the principle which restrains dealings between guardian and ward, attorney and client, heirs selling their expectancies, sailors disposing of their wages, all which transactions are *prima facie* fraudulent, and those who claim under them must establish their correctness and exemption from all fraud and imposition.   Sugden says, the rule which prohibits a trustee from purchasing the trust estate has never been applied to a purchase by a mortgagee from the mortgagor, and it was to be hoped it never would be.   He continues—in Ireland, many leases granted by mortgagors to mortgagees were set aside by Lord Redesdale, on the ground that the transaction was usurious, although that learned judge's successors have not been inclined to carry the principle as far as he did.   It will be observed, that Lord Redesdale, who held this doctrine, expressly declared that it did not impeach the dealing between mortgagor and mortgagee for a sale of the equity of redemption.   Sugden says, that a sale by a mortgagor to a mortgagee stands on the same principle as a sale between parties having no connexion with each other, and can only be impeached on the ground of fraud.   The mere circumstance that the mortgagee purchased for less than another, would not of itself be a sufficient ground to impeach the sale.—2 Sugden, 111, 112.

Were there any circumstances attending this sale which will induce a court of equity to set it aside?   The charge in the bill is, "that Mullanphy succeeded in

obtaining the sale to himself for said nominal price, by direct misrepresentations and delusive promises, practised upon and made to said Alexander McNair and his wife Margaret." Is there any evidence to maintain this allegation, which is a material one, and must be supported to obtain the relief sought by the bill? Admitting the correctness of the statement of Cleland, though he must be mistaken as to the time at which he heard the declaration of Mullanphy, that there was an arrangement between him and McNair as to the property, does that show that there were any misrepresentations made, or delusive promises held out, by Mullanphy? Even if there was an arrangement, that does not appear to have been so notorious as to have affected the bidding. The conversation between Cleland and Mullanphy relative to the agreement was in so low a tone of voice as could not have been overheard by others. There is not the least evidence that the arrangement between McNair and Mullanphy in any way whatever induced persons not to bid for the property. The letter of Major Biddle, introduced as evidence by the complainants, shows that McNair acceded to the terms proposed by Mullanphy, and gave up possession in pursuance of them. What that arrangement was we are not left to conjecture. The evidence clearly shows that it was, that Mullanphy should have the mortgage property for the mortgage debt. Although, if this were a bill for a specific performance of the agreement referred to in the letter of McNair to Biddle, the statute of frauds would forbid a resort to parole evidence to supply the omissions of the letter, or to show what the agreement was, yet as it is not set up as matter on which relief is sought, as it is not attempted to enforce it against McNair, but is used merely as evidence to repel a charge of fraud and misconduct on the part of Mullanphy, we are at a loss to conceive on what grounds the objections to it are based. The opinions of the witnesses were different as to the value of the property; yet if consideration is had of the unparalleled pecuniary distress which then universally prevailed in the country, heightened in St. Louis by the failure of the Bank of Missouri, and of the evidence of the friend and adviser of McNair, Fred. Dent, we cannot but adopt his conclusion, that the arrangement was a good one on the part of McNair; Dent is not alone in this opinion — he is sustained by witnesses of intelligence, whose experience (judging from the manner in which they testified) enabled them to form correct views on this subject. Nor is it a circumstance of little weight, that McNair himself expressed great satisfaction at the arrangement. Does the evidence, taking the depositions of the witnesses and the answer of Mrs. Biddle, show that any representation was made by Mullanphy to McNair, or that there was any promise held out which has not been beneficially realized by him? We say beneficially, for the only failure on the part of Mullanphy to comply with his arrangement was an omission to cancel or deliver up the bond for the mortgage debt — an omission which has not been attended with the least inconvenience to McNair or his representatives, and which it does not appear, from anything in the cause, had its origin in any improper motive on the part of Mullanphy.

It is said that the agreement between Mullanphy and McNair was such an one as could not have been enforced in equity on a bill for a specific performance. This may be conceded, but it would seem that the time to make that objection would

come when a specific performance of the contract is sought in equity by the defendants. They hold the land by a deed conveying the legal title, and no aid is sought by them in a court of equity. The agreement is set up in support of a legal title, and to disprove that it was obtained under such circumstances as will let in the complainants to redeem, and to repel the charge that there was any misrepresentation made, or imposition practised by Mullanphy. Under the circumstances of this case, there is little or no weight in the fact, that the bond for the payment of the mortgage debt was never surrendered nor cancelled. The agreement between Mullanphy and McNair was made about the commencement of the suit to foreclose the equity of redemption, and it is probable that it was agreed that it should be consummated in that way. The concern expressed by McNair on the day of the sale, lest he should be deceived, and the expression of his satisfaction at the assurances made by Mullanphy, that the agreement made by them should be adhered to, confirm the impression that the suit was regarded as the mode by which the arrangement should be effected. This will account for their inattention to the bond, and the length of time that has since elapsed, affording a double bar by the statutes of limitations. The fact that no use has been made or attempted with it, the willingness to deliver it up, show that the parties regarded the sheriff's deed as the act which finally consummated their agreement.

After a careful examination of this case, we are satisfied with the opinion, that there was no misconduct on the part of Mullanphy, much less such as would induce a court of equity to set aside the sale made by the sheriff, under the judgment of foreclosure.

As to the question whether Mrs. McNair is entitled to redeem as dowress, or partner of the marriage community, we do not consider that it arises on the bill. It is impossible for one to read this bill, and from its contents say, that he is informed that Mrs. McNair claims as dowress, or partner of the marriage community. Nothing is clearer than that the allegations and proof must correspond; and the rule, that under the prayer for general relief, a party may have any relief to which he is entitled, is to be understood, that the relief granted is to be founded on the facts stated in the bill, and not such as may be proved at the hearing. Chancellor Kent says, with respect to this point, "I apprehend the rule to be, that though the bill contains, as usual, a prayer for general relief, and also a prayer for specific relief, that the plaintiff may have other specific relief, provided it be consistent with the case made by the bill." (Wilkin *vs.* Wilkin, 1 Johns. Chan. Rep., 111.) To permit Mrs. McNair to redeem as partner of the community, would defeat the object of pleadings, which is to apprize a party of that against which he is to prepare a defence. The counsel of Mrs. McNair contends, that she was jointly seized with A. McNair, as partner of the community, in the lot in dispute, and is therefore entitled to redeem. This is an assumption at variance with the fact stated in the bill, that McNair, during his life, was seized in fee. But if Mrs. McNair had joined in the bill, as partner of the community with the heirs, then the heirs claiming a right to redeem on one ground, and she on one entirely different, the bill would have been multifarious, and a demurrer to it would have been sustained on that ground. A demurrer for multifariousness, as

it now stands, could not have been sustained, because that objection does not appear on the face of the bill, but the complainant would have the fruits of such an irregularity by withholding the facts from the bill, and giving them in evidence at the hearing, a mode of procedure which, if tolerated, would subvert the established forms of proceeding in courts of equity. That a bill framed according to the relief sought by Mrs. McNair would be multifarious, the cases of Devoue *vs.* Fanning, 4 Johns. Chan. Rep., 204; Dunn *vs.* Same, 2 Simms, 32; Maud *vs.* Acklom, *Ibid.*, 331; Salvidge *vs.* Hyde, Eng. Com. Chan. Rep., 68; Attorney-General *vs.* St. Johns' College, 10 Eng. Com. Chan. Rep., 38, show. Conceiving that Mrs. McNair's right to redeem is not properly before the court, we give no opinion as to the validity of the proceedings against her, on the petition to foreclose the mortgage, nor as to her right to redeem as partner of the community, or as dowress; but will reverse the decree of the court below, and decree that as to all the complainants, except Margaret S. McNair, the bill be dismissed, and as to her, that it be dismissed without prejudice to another suit, and that the complainants pay all costs.