LOUISVILLE JOINT STOCK LAND BANK *v.* RADFORD.

No. 717. Argued April 1, 2, 1935.—Decided May 27, 1935.

556

558

*Messrs. John W. Davis* and *Wm. Marshall Bullitt,* with whom *Mr. John E. Tarrant* was on the brief, for petitioner.

*Mr. William Lemke,* Special Assistant Attorney General of North Dakota, and *Mr. Harry H. Peterson,* Attorney General of Minnesota, with whom *Mr. P. O. Sathre,* Attorney General of North Dakota, and *Messrs. David A. Sachs, Jr.,* and *Frank Rives* were on the brief, for respondent.

564

566

568

570

*Mr. Edwin A. Krauthoff,* with whom *Messrs. Herbert C. Lust, David A. Sachs, Jr.,* and *Frank Rives* were on the brief, for respondent.

Mr. Justice Brandeis delivered the opinion of the Court.

This case presents for decision the question whether sub-section (s) added to § 75 of the Bankruptcy Act [1] by

---

[1] Section 75 had been added to the Bankruptcy Act on March 3, 1933, by c. 204, 47 Stat. 1470. .

the Frazier-Lemke Act, June 28, 1934, c. 869, 48 Stat. 1289, is consistent with the Federal Constitution. The federal court for western Kentucky, 8 F. Supp. 489, and the Circuit Court of Appeals for the Sixth Circuit, 74 F. (2d) 576, held it valid in this case; and it has been sustained elsewhere.[2] In view of the novelty and importance of the question, we granted certiorari.

In 1922 (and in 1924) Radford mortgaged to the Louisville Joint Stock Land Bank a farm in Christian County, Kentucky, comprising 170 acres, then presumably of the appraised value of at least $18,000.[3] The mortgages were given to secure loans aggregating $9,000, to be repaid in instalments over the period of 34 years with interest at the rate of 6 per cent. Radford's wife joined in the mortgages and the notes. In 1931 and subsequent years, the Radfords made default in their covenant to pay the taxes. in 1932 and 1933, they made default in their promise to pay the instalments of interest and principal. In 1933,

---

[2] *Bradford* v. *Fahey,* 76 F. (2d) 628; *In re Cope* (D. C. Colo.), 8 F. Supp. 778; *Galloway* v. *Union Trust Co.* (D. C. E. D. Arkansas), 9 F. Supp. 575; *In re Plumer* (D. C. S. D. Cal.), 9 F. Supp. 923; *In re Cyr* (D. C. N. D. Ind.), 9 F. Supp. 697; *In re Jones* (D. C. W. Mo.), 10 F. Supp. 165. Compare *In re Bradford,* 7 F. Supp. 665, rev. in *Bradford* v. *Fahey, supra; In re Moore,* 8 F. Supp. 393; *Paine* v. *Capital Freehold Land & Trust Co.,* 8 F. Supp. 500; *In re Miner,* 9 F. Supp. 1; *In re Duffy,* 9 F. Supp. 166; *In re Doty,* 10 F. Supp. 195; *In re Payne,* 10 F. Supp. 649 (holding the Act unconstitutional).

[3] The Bank was organized under the Federal Farm Loan Act of July 17, 1916, c. 245, 39 Stat. 360. Section 12 of the Act provided that loans should not exceed 50 per cent. of the value of the land mortgaged and 20 per cent. of the value of permanent insured improvements thereon. The Bank loaned the Radfords $8,000 in 1922 and an additional $1,000 in 1924. The stocks and bonds of the Bank are privately owned. The bonds " being instrumentalities of the Government of the United States " are tax exempt. Compare *Smith* v. *Kansas City Title Co.,* 255 U. S. 180; *Federal Land Bank* v. *Crosland,* 261 U. S. 374; Act of May 12, 1933, c. 25, § 29, 48 Stat. 46.

they made default, also, in their covenant to keep the buildings insured. The Bank urged the Radfords to endeavor to refinance the indebtedness pursuant to the provisions of the Emergency Farm Mortgage Act, May 12, 1933, c. 25, 48 Stat. 41.[4] After they had declined to do so, the Bank, having declared the entire indebtedness immediately payable, commenced, in June, 1933, a suit in the Circuit Court for Christian County against the Radfords and their tenant to foreclose the mortgages; and, invoking a covenant in the mortgage expressly providing therefor, sought the appointment of a receiver to take possession and control of the premises and to collect the rents and profits.

The application for the appointment of a receiver was denied, and all proceedings in the suit were stayed, upon request of the Conciliation Commissioner for Christian County appointed under § 75 of the Bankruptcy Act, as he stated that Radford desired to avail himself of the provisions of that section. Proceeding under it, Radford filed, in the federal court for western Kentucky, a petition·

---

[4] That Act empowered the Federal Land Banks and the Land Bank Commissioner to lend farmers 75 per cent. of the normal value of their land, at 4½ per cent. interest for the first five years and 5 per cent. thereafter; no repayment of principal to be required for 5 years. Act of May 12, 1933, c. 25, §§ 24, 32, 48 Stat. 43, 48; Act of June 16, 1933, c. 98, § 80, 48 Stat. 273; Act of Jan. 31, 1934, c. 7, § 10, 48 Stat. 347. Mortgage loans made to farmers by the institutions subject to the Farm Credit Administration outstanding June 30, 1934, aggregated $2,029,305,081. As of March 31, 1935, the loans had been increased to $2,661,558,017. Farm Credit Administration, Monthly Reports on Loans and Discounts, March, 1935. " The proceeds of the loans closed [in 1933–34] both by the land banks and by the Land Bank Commissioner were used principally to refinance existing indebtedness. Of the loans closed by the land banks, approximately 86.8 per cent. were used for this purpose, and of those closed by the Commissioner, 92 per cent. were so used." The Farm Real Estate Situation, 1933–34. Circular No. 354 of United States Department of Agriculture, April, 1935, p. 5.

praying that he be afforded an opportunity to effect a composition of his debts. The petition was promptly approved and a meeting of the creditors was held. But Radford failed to obtain the acceptance of the requisite majority in number and amount to the composition proposed. Then, the Bank offered to accept a deed of the mortgaged property in full satisfaction of the indebtedness to it and to assume the unpaid taxes. Radford refused to execute the deed; and on June 30, 1934, the state court entered judgment ordering a foreclosure sale.

Meanwhile, the Frazier-Lemke Act had been passed on June 28, 1934; and on August 6, 1934, and again on November 10, 1934, Radford filed amended petitions for relief thereunder. The second amended petition prayed that Radford be adjudged a bankrupt; that his property, whether free or encumbered, be appraised; and that he have the relief provided for in Paragraphs 3 and 7 of subsection (s) of the Frazier-Lemke Amendment. That Act provides, among other things, that a farmer who has failed to obtain the consents requisite to a composition under § 75 of the Bankruptcy Act, may, upon being adjudged a bankrupt, acquire alternative options in respect to mortgaged property:

1. By Paragraph 3, the bankrupt may, if the mortgagee assents, purchase the property at its then appraised value, acquiring title thereto as well as immediate possession, by agreeing to make deferred payments as follows: 2½ per cent. within two years; 2½ per cent. within three years; 5 per cent. within 4 years; 5 per cent. within 5 years; the balance within six years. All deferred payments to bear interest at the rate of 1 per cent. per annum.

2. By Paragraph 7, the bankrupt may, if the mortgagee refuses his assent to the immediate purchase on the above basis, require the bankruptcy court to

" stay all proceedings for a period of five years, during which five years the debtor shall retain possession of all or

any part of his property, under the control of the court, provided he pays a reasonable rental annually for that part of the property of which he retains possession; the first payment of such rental to be made within six months of the date of the order staying proceedings, such rental to be distributed among the secured and unsecured creditors, as their interests may appear, under the provisions of this Act. At the end of five years, or prior thereto, the debtor may pay into court the appraised price of the property of which he retains possession: *Provided,* That upon request of any lien holder on real estate the court shall cause a reappraisal of such real estate and the debtor may then pay the reappraised price, if acceptable to the lien holder, into the court, otherwise the original appraisal price shall be paid into court and thereupon the court shall, by an order, turn over full possession and title of said property to the debtor and he may apply for his discharge as provided for by this Act: *Provided, however,* That the provisions of this Act shall apply only to debts existing at the time this Act becomes effective."

Answering the amended petition, the Bank duly claimed that the Frazier-Lemke Act is, and the relief sought would be, unconstitutional. It prayed that Radford's amended petition be dismissed; that the Bank be permitted to pursue its remedies in the state court; and that it be allowed to proceed with the foreclosure sale in accordance with the judgment of that court. It refused to accept the composition and extension proposal offered by Radford; declined to consent to the proposed sale of that property to Radford at the appraised value or any value on the terms set forth in Paragraph 3; and also objected to his retaining possession thereof with the privilege of purchasing the same provided by Paragraph 7. The federal court overruled the Bank's objections; denied its prayers; adjudged Radford a bankrupt within the meaning of the Frazier-Lemke Act; and appointed a referee to take proceedings

thereunder. There was no claim that the farm was exempt as a homestead or otherwise.

The referee ordered an appraisal of all of Radford's property, encumbered and unencumbered. The appraisers found that " the fair and reasonable value of the property of the debtor on which Louisville Joint Stock Bank has a mortgage " and also the " market value of said land " was then $4,445.[5] The referee approved the appraisal, although the Bank offered in open court to pay $9,205.09 in cash for the mortgaged property; and counsel for the bankrupt admitted that the Bank had a valid lien upon it for the amount so offered to be paid, and that, under the law, if the Bank's offer to purchase the property were accepted, all the money paid in in cash would be immediately returned to it in satisfaction of the mortgage indebtedness.

The Bank refused to consent to a sale of the mortgaged property to Radford at the appraised value and filed written objections to such sale and to the manner of payments prescribed by Paragraph 3 of sub-section (s). Thereupon, the referee ordered that, for the period of five years, all proceedings for the enforcement of the mortgages be stayed; and that the possession of the mortgaged property, subject to liens, remain in Radford, under the control of the court, as provided in Paragraph 7 of sub-section (s). The referee fixed the rental for the first year at $325; and ordered that for each subsequent year the rental be fixed by the court. It was stipulated, that the

---

[5] The appraisal dated December 1, 1934 recited originally that $4,445 was the " fair and reasonable value," without mentioning the market value. It was, by leave of court, amended on December 4, 1934 to read as stated in the text. Besides the mortgaged property, Radford had a one-half interest in a half-acre lot and house thereon appraised at $150; exempt personal property appraised at $568; and non-exempt personal property at $831.50. The amount of the indebtedness other than to the Bank, and the terms of the composition offered do not appear.

annual taxes and insurance premium amount to $105; and admitted that administration charges said to amount to $22.75 must be paid from the rental. All the orders of the referee were, upon a petition for a review, duly approved by the District Court; and its decree was affirmed by the Circuit Court of Appeals on February 11, 1935.

Since entry of the judgment of the Court of Appeals, this Court has held unconstitutional provisions of state legislation in some respects comparable to the Frazier-Lemke Act. *W. B. Worthen Co.* v. *Kavanaugh, ante,* p. 56. There we said: "With studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor"; and, "So viewed they are seen to be an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security." The Bank insists, among other things, that the Frazier-Lemke Act has been here applied with like result; that the provisions of the Act, even if applied solely to mortgages thereafter executed, would transcend the bankruptcy power; and that, in any event, to apply them to preëxisting mortgages violates the Fifth Amendment of the Federal Constitution. Radford contends that the Frazier-Lemke Act is valid because it is a proper exercise of the power conferred by Article I, § 8 of the Constitution, which declares: "Congress shall have Power . . . To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." Before discussing these contentions, it will be helpful to consider the position occupied generally by mortgagees prior to the enactment here challenged.

*First.* For centuries efforts to protect necessitous mortgagors have been persistent. Gradually the mortgage of real estate was transformed from a conveyance upon condition into a lien; and failure of the mortgagor to pay on the day fixed ceased to effect an automatic foreclosure.

Courts of equity, applying their established jurisdiction to relieve against penalties and forfeitures, created the equity of redemption. Thus the mortgagor was given a reasonable time to cure the default and to require a reconveyance of the property. Legislation in many states carried this development further, and preserved the mortgagor's right to possession, even after default, until the conclusion of foreclosure proceedings.[6] But the statutory command that the mortgagor should not lose his property on default had always rested on the assumption that the mortgagee would be compensated for the default by a later payment, with interest, of the debt for which the security was given; and the protection afforded the mortgagor was, in effect, the granting of a stay. No instance has been found, except under the Frazier-Lemke Act, of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full.[7]

---

[6] See Pomeroy's Equity Jurisprudence, §§ 162-3, 376, 381-2, 1180, 1186-1190, 1219; H. W. Chaplin, The Story of Mortgage Law, 4 Harv. Law Rev. 4; William F. Walsh, Development of the Title and Lien Theories of Mortgages, 9 New York University Law Quarterly Rev. 280.

[7] It is the general rule that a holder of the equity of redemption can redeem from the mortgagee only on paying the entire mortgage debt. *Collins* v. *Riggs,* 14 W,all. 491; *Jones* v. *Van Doren,* 130 U. S. 684, 692; *American Loan & Trust Co.* v. *Atlanta Electric Ry. Co.,* 99 Fed. 313, 315-6; *Lomas & Nettleton Co.* v. *Di Francesco,* 116 Conn. 253, 258; 164 Atl. 495; *Palk* v. *Lord Clinton,* 12 Ves. Jr. 48, 58. The rule is for the protection of the mortgagee, and unless waived by him, applies even when the redeemer has an interest in only part of the mortgaged property. *Bank of Luverne* v. *Turk,* 222 Ala. 549; 133 So. 52; *Quinn Plumbing Co.* v. *New Miami Shores Corp.,* 100 Fla. 413; 129 So. 690; *Shinn* v. *Barrie,* 182 Ark. 366; 31 S. W. (2d) 540. Recognized exceptions to the rule are based on the action of the mortgagee in himself causing the lien on a part of the mortgaged property to be extinguished, *Dexter* v. *Arnold,* 1 Sumner 109, 118; *Welch* v. *Beers,* 8 Allen 151; *George* v. *Wood,* 11

This right of the mortgagee to insist upon full payment before giving up his security has been deemed of the essence of a mortgage. His position in this respect was not changed when foreclosure by public sale superseded strict foreclosure or when the legislatures of many states created a right of redemption at the sale price. To protect his right to full payment or the mortgaged property, the mortgagee was allowed to bid at the judicial sale on foreclosure.[8] In many states other statutory changes were

Allen 41; *Meachem* v. *Steele*, 93 Ill. 135; *Coffin* v. *Parker*, 127 N. Y. 117; 27 N. E. 814; or on the right of eminent domain, *Dows* v. *Congdon*, 16 How. Pr. 571; *Mutual Insurance Co.* v. *Easton & Amboy R.. Co.*, 38 N. J. Eq. 132. Where the right of redemption after foreclosure sale is based entirely on statute, a different rule may be prescribed. Compare *Northwestern Mutual Life Ins. Co.* v. *Hansen*, 205 Iowa 789; 218 N. W. 502; *Tuttle* v. *Dewey*, 44 Iowa 306; *State* v. *Carpenter*, 19 Wash. 378; 53 Pac. 342; see *Dougherty* v. *Kubat*, 67 Neb. 269, 273; 93 N. W. 317. For collections of cases, see 2 Jones, Mortgages (8th ed. 1928) §§ 1370–1377; 2 Wiltsie, Mortgage Foreclosure (4th ed. 1927) §§ 1196–1213, 1071.

[8] Compare *Pewabic Mining Co.* v. *Mason*, 145 U. S. 349, 361, 362; *Easton* v. *German-American Bank*, 127 U. S. 532; *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587, 590; *Buchler* v. *Black*, 226 Fed. 703; *Caldwell* v. *Caldwell*, 173 Ala. 216; 55 So. 515; *Felton* v. *Le Breton*, 92 Cal. 457; 28 Pac. 490; *Chillicothe Paper Co.* v. *Wheeler*, 68 Ill. App. 343; *Kock* v. *Burgess*, 176 Iowa 493; 156 N. W. 174; 158 N. W. 534; *McNair* v. *Biddle*, 8 Mo. 257; *Stover* v. *Stark*, 61 Neb. 374; 85 N. W. 286; *Paulson* v. *Oregon Surety Co.*, 70 Ore. 175; 138 Pac. 838; *Blythe* v. *Richards*, 10 Serg. & R. 261; *Archambault* v. *Pierce*, 46 R. I. 295; 127 Atl. 146. Some states have abolished by statute the general rule that a mortgagee, exercising a power of sale conferred in the mortgage, may not purchase at his own sale. See *Heighe* v. *Sale of Real Estate*, 164 Md. 259; 164 Atl. 671, 676; *Ten Eyck* v. *Craig*, 62 N. Y. 406, 421; *Galvin* v. *Newton*, 19 R. I. 176, 178; 36 Atl. 3; 2 Wiltsie, Mortgage Foreclosure (4th ed. 1927), § 869.

In England, the power conferred upon the court in foreclosure proceedings, to order a sale, instead of strict foreclosure (15 & 16 Vict., c. 86, § 48; 44 & 45 Vict., c. 41, § 25) will not be exercised over the mortgagee's objection, when the property is not likely to

made in the form and detail of foreclosure and redemption.[9] But practically always the measures adopted for the mortgagor's relief, including moratorium legislation enacted by the several states during the present depression,[10] resulted primarily in a stay; and the relief afforded rested, as theretofore, upon the assumption that no substantive right of the mortgagee was being impaired, since payment in full of the debt with interest would fully compensate him.

Statutes for the relief of mortgagors, when applied to preëxisting mortgages, have given rise, from time to time, to serious constitutional questions. The statutes were sustained by this Court when, as in *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, they were found to preserve substantially the right of the mortgagee to obtain, through application of the security, payment of the indebtedness. They were stricken down, as in *W. B. Worthen Co.* v. *Kavanaugh, ante,* p. 56, when it appeared that this substantive right was substantially abridged. Compare *W. B. Worthen Co.* v. *Thomas,* 292 U. S. 426.

*Second.* Although each of our national bankruptcy acts followed a major or minor depression,[11] none had, prior

---

bring the full amount of the mortgage debt, *Merchant Banking Co.* v. *London & Hanseatic Bank,* 55 L. J. Ch. 479; *Provident Clerks' Mutual Assn.* v. *Lewis,* 62 L. J. Ch. 89; at least, not unless security is put up to protect the objecting mortgagee; *Cripps* v. *Wood,* 51 L. J. Ch. 584; or a bidding reserved sufficient to cover the amount due the mortgagee, *Whitfield* v. *Roberts,* 5 Jur. N. S. 113. Compare *Corsellis* v. *Patman,* L. R. 4 Eq. 156; *Wooley* v. *Colman,* L. R. 21 Ch. Div. 169; *Hurst* v. *Hurst,* 16 Beav. 372.

[9] See 3 Jones, Mortgages (8th ed. 1928), c. 30.

[10] See A. H. Feller, Moratory Legislation (1933), 46 Harv. Law Rev. 1061, 1081; Commerce Clearing House, Bank Law Federal Service—" L." Unit—128 C. C. H., pp. 7802–7809.

[11] See John Hanna, Agriculture and the Bankruptcy Act (1934), 19 Minn. Law Review 1. The first Bankruptcy Act, April 4, 1800,

to the Frazier-Lemke amendment, sought to compel the holder of a mortgage to surrender to the bankrupt either the possession of the mortgaged property or the title, so long as any part of the debt thereby secured remained unpaid. The earlier bankruptcy acts created some exemptions of unencumbered property;[12] but none had attempted to enlarge the rights or privileges of the mortgagor as against the mortgagee. The provisions of the acts, so far as concerned the debtor, were aimed to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes," and to give him " a new opportunity in life and a clear field for future effort, unhampered by the pressure of discouragement and preëxisting debt." *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 244. No bankruptcy act had undertaken to supply him capital with which to engage in business in the future. Some States had granted to debtors extensive exemptions of unencumbered property from liability to seizure in satisfaction of debts; and these exemptions were recognized by the bankruptcy act of 1867, as well as that of 1898. But unless the mortgagee released his security, in order to prove in bankruptcy for the full amount of the debt, a

---

c. 19, 2 Stat. 19, followed the minor depression of 1798. The second Bankruptcy Act, August 19, 1841, c. 9, 5 Stat. 440, followed the severe depression of 1837. The third Bankruptcy Act, March 3, 1867, c. 176, 14 Stat. 517, followed the financial disturbances incident to the Civil War. The fourth Bankruptcy Act, July 1, 1898, c. 541, 30 Stat. 544, followed the depression of 1893. Farmers were first brought within the scope of our bankruptcy laws by the Act of 1841, which made voluntary bankruptcy available to all. In the Act of 1867, farmers were not, as in the Act of 1898, excluded from involuntary bankruptcy.

[12] Act of 1800, c. 19, §§ 34, 35, 2 Stat. 19, 30, 31; Act of 1841, c. 9, § 3, 5 Stat. 440, 443; Act of 1867, c. 176, § 14, 14 Stat. 517, 522.

mortgage even of exempt property was not disturbed by bankruptcy proceedings. *Long* v. *Bullard*, 117 U. S. 617.[13]

No bankruptcy act had undertaken to modify in the interest of either the debtor or other creditors any substantive right of the holder of a mortgage valid under federal law. Supervening bankruptcy had, in the interest of other creditors, affected in some respects the remedies available to lien holders. In *Continental Illinois National Bank & Trust Co.* v. *Chicago, R. I. & P. Ry. Co.*, 294 U. S. 648, where, in a proceeding for reorganization of a railroad under § 77 of the Bankruptcy Act, the District Court was held to have the power to enjoin temporarily the sale of pledged securities, this Court said: " The injunction here in no way impairs the lien, or disturbs the preferred rank of the pledgees. It does no more than suspend the enforcement of the lien by a sale of the collateral pending further action. It may be, as suggested, that during the period of restraint the collateral will decline in value; but the same may be said in respect of an injunction against the sale of real estate upon foreclosure of a mortgage; and such an injunction may issue in an ordinary proceeding in bankruptcy. *Straton* v. *New*, 283 U. S. 318, 321, and cases cited." (p. 676.) " The injunction here goes no further than to delay the enforcement of the contract. It affects only the remedy." (p. 681.)

Bankruptcy acts had, either expressly, or by implication, as was held in *Van Huffel* v. *Harkelrode*, 284 U. S. 225, 227, authorized the court to direct, in the interest of other creditors, that all liens upon property forming a part of the bankrupt's estate be marshalled; that the property be sold free of encumbrances; and that the

---

[13] Compare Hook, Does the Frazier-Lemke Amendment Grant Relief as to Debts Secured by Liens on Exempt Property (1934), 11 American Bankruptcy Review 21.

rights of all lienholders be transferred to the proceeds of the sale—a power which " had long been exercised by federal courts sitting in equity when ordering sales by receivers or on foreclosure." *First National Bank* v. *Shedd,* 121 U. S. 74, 87; *Mellon* v. *Moline Malleable Iron Works,* 131 U. S. 352, 367. Compare *Ray* v. *Norseworthy,* 23 Wall. 128, 135. But there had been no suggestion that such a sale could be made to the prejudice of the lienor, in the interest of either the debtor or of other creditors. By the settled practice, a sale free of liens will not be ordered by the bankruptcy court if it appears that the amount of the encumbrance exceeds the value of the property.[14] And the sale is always made so as to obtain for the property the highest possible price. No court appears ever to have authorized a sale at a price less than that which the lien creditor offered to pay for the property in cash.[15]

---

[14] *Federal Land Bank* v. *Kurtz,* 70 F. (2d) 46; *New Liberty Loan & Savings Assn.* v. *Nusbaum,* 70 F. (2d) 49; *In re American Magnestone Co.,* 34 F. (2d) 681; *In re Fayetteville Wagon-Wood & Lumber Co.,* 197 Fed. 180; *In re Foster,* 181 Fed. 703; *In re Gibbs,* 109 Fed. 627; *In re Cogley,* 107 Fed. 73; *In re Shaeffer,* 105 Fed. 352; *In re Styer,* 98 Fed. 290; *In re Taliafero,* Fed. Cas. No. 13,736 (Chief Justice Waite); see *Kimmel* v. *Crocker,* 72 F. (2d) 599, 601; *In re National Grain Corp.,* 9 F. (2d) 802, 803; *In re Franklin Brewing Co.,* 249 Fed. 333, 335; *In re Roger Brown & Co.,* 196 Fed. 758, 761; *In re Pittelkow,* 92 Fed. 901, 903; *Citizens Savings Bank* v. *Paducah,* 159 Ky. 583, 585; 167 S. W. 870; *Dugan* v. *Logan,* 229 Ky. 5, 12; 16 S. W. (2d) 763. Compare *In re Sloterbeck Chevrolet Co.,* 8 F. Supp. 1023; *In re Carl,* 5 F. Supp. 215; *In re Civic Center Realty Co.,* 26 F. (2d) 825. Where the mortgaged property is sold free of liens for less than the amount of the liens, the bankrupt estate and not the lienholders must bear the costs of the sale. *In re Harralson,* 179 Fed. 490; *In re Holmes Lumber Co.,* 189 Fed. 178, 181. Compare *Rubenstein* v. *Nourse,* 70 F. (2d) 482; *In re Dawkins,* 34 F. (2d) 581.

[15] In English bankruptcy proceedings, where mortgaged property is sold under order of the Commissioners, the mortgagee is permitted to bid, to prevent a sacrifice of the property, sometimes even

Thus, a sale free of liens in no way impairs any substantive right of the mortgagor; and such a sale is not analogous to the sale to the bankrupt provided for by Paragraph 7 of the Frazier-Lemke Act.

Nor do the provisions of the bankruptcy acts concerning compositions afford any analogy to the provisions of Paragraph 7. So far as concerns the debtor, the composition is an agreement with the creditors in lieu of a distribution of the property in bankruptcy—an agreement which " originates in a voluntary offer by the bankrupt, and results in the main, from voluntary acceptance by his creditors." *Nassau Smelting & Refining Works* v. *Brightwood Bronze Foundry Co.,* 265 U. S. 269, 271; *Myers* v. *International Trust Co.,* 273 U. S. 380, 383. So far as concerns dissenting creditors, the composition is a method of adjusting among creditors rights in property in which all are interested. In ordering the adjustment, the bankruptcy court exercises a power similar to that long exercised by courts of law, *Head* v. *Amoskeag Manufacturing Co.,* 113 U. S. 9, 21; and of admiralty, *The Steamboat Orleans* v. *Phoebus,* 11 Pet. 175, 183. It is the same power, which a court of equity exercises when it compels dissenting creditors, in effect, to submit to a plan of reorganization approved by it as beneficial and assented to by the requisite majority of the creditors. *Shaw* v. *Railroad Co.,* 100 U. S. 605; *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co.,* 271 U. S. 445. Compare *National Surety Co.* v. *Coriell,* 289 U. S. 426; *First National Bank* v. *Flershem,* 290 U. S. 504. In no case of composition is a secured claim affected except when the holder is a member of a class; and then only when the composi-

without previous leave of court. *Ex parte Ashley,* 3 Deac. & C. 510; *Ex parte Pedder,* 3 Deac. & C. 622; compare *Ex parte Davis,* 3 Deac. & C. 504; *Ex parte Bacon,* 2 Deac. & C. 181; *Ex parte Du Cane,* 1 Buck. 18; *Ex parte Marsh,* 1 Madd. 89.

tion is desired by the requisite majority and is approved by the court.[16] Never, so far as appears, has any composition affected a secured claim held by a single creditor. Compositions are comparable to the voluntary adjustment with the mortgagee provided for in Paragraph 3 of the Frazier-Lemke amendment. They are not analogous to the so-called adjustment compelled by Paragraph 7.

*Third.* The Bank contends that the Frazier-Lemke Act is void, because it is not a law " on the subject of Bankruptcies "; that it does not deal with that subject; and hence that it is in contravention of the Tenth Amendment, which declares: " The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The argument is that the essential features of a bankruptcy law are these: the surrender by the debtor of his property for ratable distribution among his creditors, except so far as encumbered or exempt, and the discharge by his creditors of all claims against the debtor; that, on the other hand, the main purpose, and the effect, of the Frazier-Lemke Act is to prevent distribution of the farmer-mortgagor's property; to enable him to remain in possession despite persisting default; to scale down the mortgage debt; and to give the mortgagor the option to acquire the full title to the property upon paying the reduced amount. Thus, it is urged, the Act effects a fundamental change in the relative rights of mortgagor and mortgagee

---

[16] The principle of composition was first applied to the interests of secured creditors in their security, by § 74, added to the Bankruptcy Act by Act of March 3, 1933, c. 204, § 1, 47 Stat. 1467 (individual debtors); by § 75, Act of March 3, 1933, c. 204, § 1, 47 Stat. 1470 (agricultural compositions); by § 77, Act of March 3, 1933, c. 204, § 1, 47 Stat. 1474 (railroads engaged in interstate commerce); by § 77B, Act of June 7, 1934, c. 424, § 1, 48 Stat. 912 (corporations); and by § 80, Act of May 24, 1934, c. 345, 48 Stat. 798 (public debtors). The constitutionality of such provision in § 74 was considered in *In re Landquist,* 70 F. (2d) 929, 933.

of real property as determined by the law of the State in which the property is located. The Bank argues that if the bankruptcy clause were construed to permit the making of such fundamental changes Congress could deal with every phase of the relations between an insolvent or non-paying debtor and his creditors; that it might, among other things, divest state courts of jurisdiction over suits upon promissory notes between citizens of the same State; that commercial controversies arising from breach of contract might be brought under like control; that the obtaining of goods or credits by false pretences, for example, could be made a crime against the United States, despite the rule declared in *United States* v. *Fox*, 95 U. S. 670; that the commercial and financial life of each State would be in large measure subject to federal regulation; and that the lines between State and Federal Government could thus be redrawn by Congress.

It is true that the original purpose of our bankruptcy acts was the equal distribution of the debtor's property among his creditors; and that the aim of the legislation was to do this promptly.[17] But, the scope of the bankruptcy power conferred upon Congress is not necessarily limited to that which has been exercised. The first act provided only for compulsory proceedings against traders,

[17] See *Bailey* v. *Glover*, 21 Wall. 342, 346; *Mayer* v. *Hellman*, 91 U. S. 496, 501; *Wiswall* v. *Campbell*, 93 U. S. 347, 350; *Hanover National Bank* v. *Moyses*, 186 U. S. 181, 186; *Acme Harvester Co.* v. *Beekman Lumber Co.*, 222 U. S. 300, 307; *Williams* v. *U. S. Fidelity & Guaranty Co.*, 236 U. S. 549, 554; *Straton* v. *New*, 283 U. S. 318, 320. Also *In re California Pacific R. Co.*, Fed. Cas. No. 2,315; *In re Jordan*, Fed. Cas. No. 7,514; *In re Reiman*, Fed. Cas. No. 11,673; *In re Vogler*, Fed. Cas. No. 16,986; *Leidigh Carriage Co.* v. *Stengel*, 95 Fed. 637, 647; *In re Swofford Bros. Dry Goods Co.*, 180 Fed. 549, 556; Story on The Constitution (4th ed.) § 1106; Olmstead, Bankruptcy, A Commercial Regulation, 15 Harv. Law Rev. 829; Levinthal, The Early History of Bankruptcy Law, 66 U. of Pa. Law Rev. 223, 225.

bankers, brokers and underwriters. The operation of later ones has been gradually extended so as to include practically all insolvent debtors; to provide for voluntary petitions; and to permit compositions with creditors, even without an adjudication of bankruptcy. The discharge of the debtor has come to be an object of no less concern than the distribution of his property. *Hanover National Bank* v. *Moyses*, 186 U. S. 181. As was said in *Continental Illinois National Bank & Trust Co.* v. *Chicago, R. I. & P. Ry. Co.*, 294 U. S. 648: " The fundamental and radically progressive nature of these extensions becomes apparent upon their mere statement; but all have been judicially approved or accepted as falling within the power conferred by the bankruptcy clause of the Constitution." [18]

It is true that the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none; and that the

---

[18] The oft-quoted definitions of the bankruptcy power indicate its broad scope. When in *In re Klein* (reported in a note to *Nelson* v. *Carland*, 1 How. 265, 277) the constitutionality of the Bankruptcy Act of 1841 was challenged because it brought within its scope insolvent debtors other than traders and provided for voluntary proceeding, Mr. Justice Catron, sitting in Circuit said: " I hold it [the bankruptcy power] extends to all cases where the law causes to be distributed the property of the debtor among his creditors; this is its least limit. Its greatest is a discharge of the debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of Congress." Judge Blatchford when sustaining the provision for composition in *In re Reiman*, Fed. Cas. No. 11,673, p. 496, said that the subject of bankruptcy cannot properly be defined as " anything less than the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief." And Mr. Justice Hunt, sitting in that case, on appeal to the Circuit Court said that " whatever relates to the subject of bankruptcy is within the jurisdiction of congress." Fed. Cas. No. 11,675, p. 501.

Frazier-Lemke Act is the first instance of an attempt, by a bankruptcy act, to abridge, solely in the interest of the mortgagor, a substantive right of the mortgagee in specific property held as security. But we have no occasion to decide in this case whether the bankruptcy clause confers upon Congress generally the power to abridge the mortgagee's rights in specific property. Paragraph 7 declares that " the provisions of this Act shall apply only to debts existing at the time this Act becomes effective." The power over property pledged as security after the date of the Act may be greater than over property pledged before; and this Act deals only with preëxisting mortgages. Because the Act is retroactive in terms and as here applied purports to take away rights of the mortgagee in specific property, another provision of the Constitution is controlling.

*Fourth.* The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment.[19] Under the bankruptcy power Congress may discharge the debtor's personal obligation, because, unlike the States, it is not prohibited from impairing the obligation of contracts. Compare *Mitchell* v. *Clark,* 110 U. S. 633, 643. But the effect of the Act here complained of is not the discharge of Radford's personal obligation.

---

[19] For instance, the war power, *Ex parte Milligan,* 4 Wall. 2, 119; *Ochoa* v. *Hernandez,* 230 U. S. 139, 153–4; *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 155. The power to tax, *United States* v. *Railroad Co.,* 17 Wall. 322; *Boyd* v. *United States,* 116 U. S. 616; *Nichols* v. *Coolidge,* 274 U. S. 531, 542; *Blodgett* v. *Holden,* 275 U. S. 142, 147; *Barclay & Co.* v. *Edwards,* 267 U. S. 442, 450; *Heiner* v. *Donnan,* 285 U. S. 312, 326. The power to regulate commerce, *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505, 571; *Carroll* v. *Greenwich Insurance Co.,* 199 U. S. 401, 410; *United States* v. *Lynah,* 188 U. S. 445, 471; *United States* v. *Cress,* 243 U. S. 316, 326. The power to exclude aliens, *Wong Wing* v. *United States,* 163 U. S. 228, 236, 237–8. Compare *Perry* v. *United States,* 294 U. S. 330.

It is the taking of substantive rights in specific property acquired by the Bank prior to the Act. In order to determine whether rights of that nature have been taken, we must ascertain what the mortgagee's rights were before the passage of the Act. We turn, therefore, first to the law of the State.

Under the law of Kentucky, a mortgage creates a lien which may be foreclosed only by suit resulting in a judicial sale of the property. Civil Code of Practice, §§ 375, 376; *Insurance Co. of North America* v. *Cheatham,* 221 Ky. 668, 672; 299 S. W. 545. While mere default does not entitle the mortgagee to possession, *Newport & Cincinnati Bridge Co.* v. *Douglass,* 12 Bush 673, 705, § 299 of the Code provides that, in an action for the sale of mortgaged property a receiver may be appointed if it appears " that the property is probably insufficient to discharge the mortgage debt," *Mortgage Union* v. *King,* 245 Ky. 691; 54 S. W. (2d) 49; and where there is (as here) a pledge in the mortgage of rents, issues and profits, and provision for appointment of a receiver, the mortgagee is entitled as of right to have a receiver appointed to collect them for his benefit, *Brasfield & Son* v. *Northwestern Mutual Life Ins. Co.,* 233 Ky. 94; 25 S. W. (2d) 72; *Watt's Administrator* v. *Smith,* 250 Ky. 617, 630; 63 S. W. (2d) 796. Under § 374 of the Code a sale may be ordered at any time after default. Under Carroll's Stat. (1930), §§ 2362, 2364, there must be an appraisal before the sale; and if the sale brings less than two-thirds of the appraised value the mortgagor may redeem within a year by paying the original purchase money and interest at 10 per cent. But inadequacy of price is not alone ground for setting aside a sale. *Kentucky Joint Land Bank* v. *Fitzpatrick,* 237 Ky. 624; 36 S. W. (2d) 25. No provision permits the mortgagor to obtain a release or surrender of the property before foreclosure without paying in full the indebtedness secured. Nor does any provision prohibit a mortgagee

from protecting his interest in the property by bidding at the foreclosure sale. Thus, the controlling purpose of the law of Kentucky was and is that mortgaged property shall be devoted primarily to the satisfaction of the debt secured; and the provisions of its law are appropriate to ensure that result.

For the rights acquired and possessed by the mortgagee under the law of Kentucky, the Act substituted only the following alternatives:

(A) Under Paragraph 3, the mortgagee may, if the bankrupt so requests, assent to a so-called sale by the trustee to the bankrupt at a so-called appraised value; and upon such assent an implied promise arises to purchase the property on the terms prescribed in that Paragraph. But, the transaction would not confer upon the mortgagee the ordinary fruits of an immediate sale; nor would the agreement of sale, if performed by the bankrupt, result in payment at the appraised value. The mortgagee would not get the ordinary fruits of an immediate sale on deferred payments; for the bankrupt would make no down payment at the time of taking possession and would give no other assurance that the payments promised would in fact be made. And, if all such payments were duly made, the sale would not be at the appraised value; for the value of money (even if there were no risk) is obviously more than one per cent.[20] By restricting, throughout the period of six years, the annual interest on the deferred payments to one per cent., a sale at much less than the appraised value is prescribed. The aggregate payments of principal and interest prescribed would in no year before the end of the sixth be as much

---

[20] In no state of the Union, in 1921, was the maximum lawful rate of interest less than 6 per cent. per annum; and in only two states was the legal rate as low as 5 per cent. Ryan, Usury and Usury Laws (1924), pp. 28–31. In Kentucky, 6 per cent. is both the legal and the lawful rate. Carroll's Ky. Stat. (1933), §§ 2218, 2219.

as six per cent. on the appraised value.[21]   Moreover, be-fore any deferred payment of the purchase price is made, there is serious danger that the Bank's investment might be further impaired.   The mortgaged property might be lessened in value by waste.   It might become burdened with the liens for accruing unpaid taxes; [22] for, while in-terest at the rate of 1 per cent. of the appraised value of the Radford farm is $44.45, the present annual taxes (plus insurance premium) are, as stipulated, $105.   Thus if the alternative offered by Paragraph 3 were accepted, the transaction would result merely in a transfer of pos-session to the bankrupt for six years with an otherwise unsecured promise to purchase at the end of the period for a price less than the appraised value.

(B)  If the mortgagee refuses to consent to the agree-ment to sell under Paragraph 3, he is compelled, by Para-graph 7, to surrender to the bankrupt possession of the property for the period of five years; and during those

---

[21] The prescribed payment (interest) for the first year is 1 per cent. on the appraised value.  The prescribed payment for the second year is 3½ per cent. thereof (1 per cent. for interest, 2½ per cent. on ac-count of principal).  The prescribed payment for the third year is 2½ per cent. of the principal and as interest 1 per cent. on 97½ per cent. of the principal.  The prescribed payment for the fourth year is 5 per cent. on account of the principal and as interest, 1 per cent. on 95 per cent. of the principal.  The prescribed payment for the fifth year is 5 per cent. on account of principal, and as interest, 1 per cent. on 90 per cent. of the principal.  The prescribed payment at the end of the sixth year is 85 per cent. of the principal, and as interest 1 per cent. of 85 per cent. of the principal.  The present value calculated on a 6 per cent. basis, of all deferred payments (principal and inter-est) would be only 76.6 per cent. of the appraised value.  In other words, the agreement to sell if assented to by the mortgagee would require him to relinquish his security not for its appraised value in cash, but for deferred payments which, if met, would yield (on a 6 per cent. basis) only 76.6 per cent. of the appraised value.

[22] When the decree complained of was issued there had already been defaults in tax payments continuing more than two years.  See page 1.

years, the bankrupt's only monetary obligation is to pay a reasonable rental fixed by the court. There is no provision for the payment of insurance or taxes, save as these may be paid from the rental received. During that period the bankrupt has an option to purchase the farm at any time at its appraised, or reappraised, value.[23] The mortgagee is not only compelled to submit to the sale to the bankrupt, but to a sale made at such time as the latter may choose. Thus, the bankrupt may leave it uncertain for years whether he will purchase; and in the end he may decline to buy. Meanwhile the mortgagee may have had (and been obliged to decline) an offer from some other person to take the farm at a price sufficient to satisfy the full amount then due by the debtor. The mortgagee cannot require a reappraisal when, in its judgment, the time comes to sell; it may ask for a reappraisal only if and when the bankrupt requests a sale. Thus the mortgagee is afforded no protection if the request is made when values are depressed to a point lower than the original appraisal. While Paragraph 7 declares that the bankrupt's possession is "under the control of the court," this clause gives merely supervisory power. Such control leaves the court powerless to terminate the option unless there has been the commission of waste or failure to pay the prescribed rent.

[23] This is the construction given to Paragraph 7 by both of the lower courts, by both of the parties in their briefs and oral arguments here, and, so far as appears, by all other courts and judges that have passed upon the Act, except District Judge Lindley, who, in *In re Miner*, 9 F. Supp. 1, held that Paragraph 7, as well as Paragraph 3, was conditioned upon the mortgagee's consent to a sale to the debtor at the appraised value. See also John Hanna, Agriculture and the Bankruptcy Act, 19 Minn. L. Rev. 1, 19, 20; Report of Judiciary Committee, No. 370, p. 2, 74th Congress, 1st Session, April 1, 1935, on H. R. 5452. We refrain from discussing this question of construction as well as some others raised which are deemed unfounded.

*Fifth.* The controlling purpose of the Act is to preserve to the mortgagor the ownership and enjoyment of the farm property. It does not seek primarily a discharge of all personal obligations—a function with which alone bankruptcy acts have heretofore dealt. Nor does it make provision of that nature by prohibiting, limiting or post-poning deficiency judgments, as do some State laws.[24] Its avowed object is to take from the mortgagee rights in the specific property held as security; and to that end " to scale down the indebtedness " to the present value of the property.[25] As here applied it has taken from the Bank the following property rights recognized by the Law of Kentucky:

1. The right to retain the lien until the indebtedness thereby secured is paid.

2. The right to realize upon the security by a judicial public sale.

3. The right to determine when such sale shall be held, subject only to the discretion of the court.

4. The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the pro-

---

[24] This has been done by recent state legislation. Compare Arizona, 1933, c. 88; Arkansas, 1933, Act No. 57; see *Adams* v. *Spillyards,* 187 Ark. 641; 61 S. W. (2d) 686; California, 1933, c. 793; Idaho, 1933, c. 150; Kansas, 1935, H. B. 299; Louisiana, 1934, Act No. 28; Minnesota, 1933, c. 339; Montana, 1935, H. B. 16; Nebraska, 1933, c. 41; New Jersey, 1933, c. 22; see *Vanderbilt* v. *Brunton Piano Co.,* 111 N. J. L. 596; 169 Atl. 177; New York, 1933, c. 794; 1934, c. 277; 1935, c. 2; North Carolina, 1933, c. 36; North Dakota, 1933, c. 155; South Carolina, 1933, Act No. 264; South Dakota, 1933, c. 138, 1935, H. B. 109; Texas, 1933, c. 92; see *Langever* v. *Miller,* 124 Tex. 80; 76 S. W. (2d) 1025.

[25] See Senate Report No. 1215 on S. 3580, May 28, 1934, p. 3; House Report No. 1898 on H. R. 9865, June 4, 1934, p. 4, incorporating as a part thereof a memorandum of Representative Lemke.

ceeds of a fair competitive sale or by taking the property itself.

5. The right to control meanwhile the property during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt.

Strong evidence that the taking of these rights from the mortgagee effects a substantial impairment of the security is furnished by the occurrences in the Senate which led to the adoption there of the amendment to the bill declaring that the Act " shall apply only to debts existing at the time this Act becomes effective." The bill as passed by the House applied to both preëxisting and future mortgages. It was amended in the Senate so as to limit it to existing mortgages; and as so amended was adopted by both Houses pursuant to the report of the Conference Committee.[26] This was done because, in the Senate, it was pointed out that the bill, if made applicable to future mortgages, would destroy the farmer's future mortgage credit.[27]

---

[26] See Conference Report, June 18, 1934, 73d Cong., 2d Sess., 78 Cong. Rec., pp. 12,376, 12,491.

[27] Senator Bankhead said: " If it applied only to existing mortgages, I should be glad to support it; but here is a program presented, not limited to existing mortgages, but a permanent program for the composition of mortgages. When a farmer goes to his advancing merchant, or goes to his banker, or applies to an insurance company for a loan under this bill, I want to know, and I am enquiring with earnest anxiety about it, what effect is it going to have upon those credit facilities for the farmers of this country." Id., p. 12,074.

Senator Fess: " It does seem to me that we might destroy the credit which he insists the farmers have, because everyone realizes that by the passage of this bill we may be making it impossible for the farmer in the future to borrow money." Id., p. 12,075.

Representative Peyser expressed the same view: " I believe that many of the Members are overlooking a very vital point in connection with this legislation—that is the fact that you are removing from

*Sixth.* Radford contends that these changes in the position of the Bank wrought pursuant to the Act, do not impair substantive rights, because the Bank retains every right in the property to which it is entitled. The contention rests upon the unfounded assertion that its only substantive right under the mortgage is to have the value of the security applied to the satisfaction of the debt. It would be more accurate to say that the only right under the mortgage left to the Bank is the right to retain its lien until the mortgagor, sometime within the five-year period, chooses to release it by paying the appraised value of the property. A mortgage lien so limited in character and incident is of course legally conceivable. It might be created by contract under existing law.[28] If a part of the mortgaged property were taken by eminent domain a mortgagee would receive payment on a similar basis.[29] But the Frazier-Lemke Act does not purport to exercise the right of eminent domain; and neither the law of Kentucky nor Radford's mortgages contain any provision conferring upon the mortgagor an option to compel, at any time within five years, a release of the farm upon payment of its appraised value and a right to retain meanwhile possession, upon paying a rental to be fixed by the bankruptcy courts.

Equally unfounded is the contention that the mortgagee is not injured by the denial of possession for the five years,

the farmer the possibility of securing any mortgage assistance in the future. I believe in the enactment of this law and the scaling down of values you are going to take away the possibility of help that may be needed by these farmers in the future." *Id.,* p. 12,137.

[28] Many instances can be found of mortgages which provide that parcels of the mortgaged property shall be released upon payment of fixed amounts or upon payment of their value upon an appraisal therein provided for. See 1 Jones, Mortgages (8th ed. 1928), § 98. Compare *Clarke* v. *Cowan,* 206 Mass. 252.

[29] See 2 Jones, Mortgages (8th ed. 1928), § 843.

since it receives the rental value of the property.[30]  It is argued that experience has proved that five years is not unreasonably long, since a longer period is commonly required to complete a voluntary contract for the sale and purchase of a farm; or to close a bankruptcy estate; or to close a railroad receivership.  And it is asserted that Radford is, in effect, acting as receiver for the bankruptcy court.  Radford's argument ignores the fact that in ordinary bankruptcy proceedings and in equity receiverships, the court may in its discretion, order an immediate sale and closing of the estate; and it ignores, also, the fundamental difference in purpose between the delay permitted in those proceedings and that prescribed by Congress.  When a court of equity allows a receivership to continue, it does so to prevent a sacrifice of the creditor's interest.  Under the Act, the purpose of the delay in making a sale and of the prolonged possession accorded the mortgagor is to promote his interests at the expense of the mortgagee.

*Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, upon which Radford relies, lends no support to his contention.  There the statute left the period of the extension of the right of redemption to be determined by the court within the maximum limit of two years.  Even after the

---

[30] Counsel for the debtor suggests that the reasonable rental provided for in Paragraph 7, is more than the secured creditor ordinarily receives in bankruptcy, since interest on secured as well as unsecured claims ceases with the filing of the petition.  But the rule relied upon applies only when the secured creditor, having realized upon his security, is seeking as a general creditor to prove for the deficiency against the bankrupt estate.  *Sexton* v. *Dreyfus,* 219 U. S. 339.  It has no application when the mortgagee has a preferred claim against proceeds realized by the trustee from a sale of the security free of liens.  *Coder* v. *Arts,* 213 U. S. 223, 228, 245, affirming 152 Fed. 943, 950; *People's Homestead Assn.* v. *Bartlette,* 33 F. (2d) 561; *Mortgage Loan Co.* v. *Livingston,* 45 F. (2d) 28, 34.

period had been decided upon, it could, as was pointed out, " be reduced by order of the court under the statute, in case of a change in circumstances, . . . ." (p. 447); and at the close of the period, the mortgagee was free to apply the mortgaged property to the satisfaction of the mortgage debt. Here, the option and the possession would continue although the emergency which is relied upon as justifying the Act ended before November 30, 1939.[31]

*Seventh.* Radford contends further that the changes in the mortgagee's rights in the property, even if substantial, are not arbitrary and unreasonable, because they were made for a permissible public purpose. That claim appears to rest primarily upon the following propositions: (1) The welfare of the Nation demands that our farms be individually owned by those who operate them. (2) To permit widespread foreclosure of farm mortgages would result in transferring ownership, in large measure, to great corporations; would transform farmer-owners into tenants or farm laborers; and would tend to create a peasant class. (3) There was grave danger at the time of the passage of the Act, that foreclosure of farms would become widespread. The persistent decline in the prices of agricultural products, as compared with the prices of articles which farmers are obliged to purchase, had been accentuated by the long continued depression and had made it impossible

---

[31] As by § 75 the petition of the farmer-mortgagor may be filed at any time within five years after March 3, 1933, and the period of the possession and of the option extends for five years, the provision might bar enforcement of an existing mortgage until 1943.

Counsel for Radford contends that the five year provision of Paragraph 7 is not inflexible, because, under the rule of *Chastleton Corporation* v. *Sinclair,* 264 U. S. 543, it would cease to be effective on the termination of the emergency which is relied upon to justify the Act. But the Act does not make the five year option period dependent upon the continuance of a national emergency; and the options conferred upon the farmer-owner show that it was the needs of the particular debtor to which consideration was given.

for farmers to pay the charges accruing under existing mortgages. (4) Thus had arisen an emergency requiring congressional action. To avert the threatened calamity the Act presented an appropriate remedy. Extensive economic data, of which in large part we may take judicial notice, were submitted in support of these propositions.

The Bank calls attention, among other things, to the fact that the Act is not limited to mortgages of farms operated by the owners; that the finding of the lower courts that Radford is a farmer within the meaning of the Act does not necessarily imply that he operates his farm; and that at least part of it must have been rented to another, since a tenant is joined as defendant in the foreclosure suit. Section 75 of the Bankruptcy Act (to which this Act is an amendment), provides in sub-section (r) that " the term ' farmer ' means any individual who is personally bona fide engaged primarily in farming operations or the principal part of whose income is derived from farming operations." Thus, the Act affords relief not only to those owners who operate their farms, but also to all individual landlords the " principal part of whose income is derived " from the " farming operations " of share croppers or other tenants; and, among these landlords, to persons who are merely capitalist absentees.[32]

---

[32] In 1930, only 56 per cent. of the farm mortgage debt of the country rested on farms operated by their owners. The Farm Debt Problem, Letter from the Secretary of Agriculture, House Doc. No. 9, p. 9, 73d Cong., 1st Sess. Of the landlords of farms throughout the United States: " More than a third are engaged in agricultural occupations, nearly another third are retired farmers, and the remaining third are in non-agricultural occupations, mostly country bankers, merchants and professional men in the country towns and villages who have either come into farm ownership through inheritance or marriage, or have purchased farms for purposes of investment or speculation." Yearbook of Agriculture (1923), p. 538. " Furthermore, the percentage of cases in which landlords were remote from their farms is higher in some of the more recently developed farming regions than

It has been suggested that the number of farms oper-
ated by tenants was very large before the present depres-
sion; [33] that the increase of tenancy had been progressive
for more than half a century; [34] that the increase has not
been attributable, in the main, to foreclosures; [35] and that,

in some of the older farming regions. Thus in eastern North Dakota
40 per cent. of the tenant farms were owned by landlords not residing
in the same county and the proportion is nearly as large in central
Kansas and in Oklahoma." *Id.*, p. 535.

[33] Of the 6,288,648 farms in 1930, 42.4 per cent. were operated by
tenants. The percentage in Kentucky operated by tenants was 35.9
per cent.; in Iowa, 47.3 per cent.; in Georgia, 68.2 per cent. In the
South, 1,790,783 families were working as tenant farmers. See Hear-
ings, March 5, 1935, on S. 2367, the Bill to create the Farm Tenant
Homes Corporation, pp. 6, 14, 15, 16, 18, 39, 70, 72, 75, and Sen. Rep.
446, 74th Cong., 1st Sess., April 11, 1935.

[34] During the half century prior to the present business depression,
every decennial census recorded a progressive increase in farm tenancy.
Of the 4,008,907 farms in the United States in 1880, 25.6 per cent.
were operated by tenants; of the 6,448,343 farms in 1920, 38.1 per
cent. were operated by tenants. Farm Tenure, Census of 1920,
Agriculture, Vol. V, p. 133, T. 11. The percentage of improved farm
land operated by owners in 1920 was only 46.8. Farm Ownership &
Tenancy, Yearbook of Agriculture (1923), p. 509.

[35] " Causes underlying this upward trend of tenancy are complex
and obscure. The trend has apparently continued through the vari-
ous shades of adversity and prosperity. Farms operated by man-
agers are not classed with tenancy. As has been pointed out before,
the best, most productive lands have the greatest tenancy. Appar-
ently tenancy does not thrive on poor lands. It is hardly thinkable
that high productiveness is a result of tenancy. It is a fact, how-
ever, that the largest up-trend in the yield of corn per acre is in the
area of greatest tenancy." Iowa Year Book of Agriculture (1931),
p. 349. In Iowa, 1927, tenant operated acres were 53.9 per cent. of
the total acres in farms. In 1930 the percentage was 54.8; in 1931,
it was 55.4. In 1932 it was 57.7; in 1933, 58.6. *Id.* (1932) p. 168;
(1933) p. 213. See also Yearbook of Agriculture (1923), pp. 539–
547; Turner, Ownership of Tenant Farms in the United States.
Bull. No. 1432, and Ownership of Tenant Farms in North Central
States, Bull. No. 1433, U. S. Dep't of Agriculture (1926).

in some regions, the increase in tenancy has been marked during the period when farm incomes were large and farm values, farm taxes and farm mortgages were rising rapidly.[36]

We have no occasion to consider either the causes or the extent of farm tenancy; or whether its progressive increase would be arrested by the provisions of the Act. Nor need we consider the occupations of the beneficiaries of the legislation. These are matters for the consideration of Congress; and the extensive provision for the refinancing of farm mortgages which Congress has already made, shows that the gravity of the situation has been appreciated.[37] The province of the Court is limited to deciding whether the Frazier-Lemke Act as applied has taken from the Bank without compensation, and given to Radford, rights in specific property which are of substantial value. Compare *Ochoa* v. *Hernandez,* 230 U. S. 139, 161; *Loan Association* v. *Topeka,* 20 Wall. 655, 662, 664; *In re Dillard,* Fed. Cas. No. 3,912, p. 706. As we conclude that the Act as applied has done so, we must

---

[36] " The increase in tenancy in the West North Central States is without doubt the result of the price situation. Land bought in the period of high prices could not be paid for, with the result that it is now operated by tenants." Yearbook of Agriculture, 1932, p. 494. From 1910 to 1920, farm mortgage debt increased from $3,320,470,000 to $7,857,700,000. See The Farm Debt Problem, House Doc. No. 9, p. 5, 73d Cong., 1st Sess. In 1910 the total acreage of farm land was 878,798,325; in 1920, it was 955,883,715. Census of 1920, Agriculture, Vol. V, p. 32, T. 3. The greatly increased local tax rate, in connection with increased land values, has been suggested as being an important cause of increasing farm tenancy. Hearings on S. 2367, p. 16. The average value of farm property per acre in 1880, was $22.72; in 1920, $81.52; in 1930, $58.01. Census of 1930, Agriculture, Vol. II, p. 10, T. I. Farm property taxes in 1910 amounted to approximately $268 millions; in 1920, to $452 millions; in 1932, to $629 millions. See The Farm Debt Problem, *supra,* p. 21.

[37] See Note 4.

hold it void. For the Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

*Reversed.*