## In re McGREW.
### No. 7824.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 5, 1941.

Decided March 23, 1942.

Frank W. Stonecipher, of Pittsburgh, Pa., for appellant.

Francis R. Harbison, of Pittsburgh, Pa. (James McGill Boyer and John M. Shane, both of Pittsburgh, Pa., on the brief), for appellee.

Before CLARK and JONES, Circuit Judges, and GANEY, District Judge.

CLARK, Circuit Judge.

The farmer in almost every nation has been excluded from the class against whom involuntary bankruptcy proceedings may be brought.[1] This general cloak of protection,[2] however, does not wholly explain the reasons for the special advantages afforded the farmer-debtor by the Frazier-Lemke Act.[3] It is true that the economic condition of the farmer had grown steadily worse.[4] However, one cannot overlook the historical fact that the American farmer has always been zealous in his own interests.[5] At any rate state laws were enacted to extend the period of mortgage redemption, to prohibit deficiency judg-

[1] 11 U.S.C.A. § 22 sup. b. In the Latin countries, Italy, France and Spain, the application of bankruptcy has been limited to commercial debtors exclusively. Dunscomb, Bankruptcy—A Study in Comparative Law, 15. Switzerland, Belgium, Greece and Mexico provided bankruptcy proceedings for merchants only. King, Bankruptcy In Other Lands, 35 Commercial Law Journal 615; Bankruptcy Procedure in Belgium, 5 Journal of National Association of Referees in Bankruptcy 89; Tambacopoulos, Bankruptcy Laws of Greece, 8 Journal of National Association of Referees in Bankruptcy 155; Mejorada, Brief Summary of Bankruptcy Laws of Republic of Mexico, 5 Journal of National Association of Referees in Bankruptcy 109. Denmark included traders, shipowners and manufacturers only. Kemp, Danish Laws, Rules Relating to Bankruptcy and Composition, 5 Journal of National Association of Referees in Bankruptcy 103. Under the first bankruptcy laws of England, farmers were excluded from compulsory bankruptcy. 13 Eliz. 1570; 1 and 23 James I. But now any debtor may become an involuntary bankrupt. Act of 4 & 5 George V (1914), c. 59, sec. 1. Canada, however, like ourselves, still exempts farmers. Act of 9 & 10 George V (1919), c. 36, sec. 8(1).

[2] The basis for this exclusion is said to be the intent of Congress to protect men engaged in agriculture who might fall behind in their debts because of the failure of crops for one or two seasons. In re Doroski, D.C., 271 F. 8.

[3] 11 U.S.C.A. § 203, sub. s.

[4] The feeding of a war-torn and hungry Europe required the plowing of much sub-marginal land and the increasing of all farm stocks. The later collapse of this foreign market caused in part by our having become a high tariff creditor nation and in part by the introduction of products from Canada, Argentine, Australia, and South Africa left our farmers with a problem of overproduction. The American farmer did not share in the high prosperity of the post-war years. His standard of living was only sustained through an expansion of his mortgage indebtedness, Annual Report of Secretary of Agriculture (1931) 24. As his debt structure continued to pile up, the farmer found it increasingly difficult to liquidate, for farming had become a losing business. The gap between farm prices and the general price level continued to widen. Yearbook of Agriculture (1932) 895. In the three years following 1929 farm income declined some 60 per cent. Foreclosures increased with the decline of land values. The Farm Real Estate Situation (1931-1932) Circular No. 261, Bureau of Agricultural Economics, U. S. Department of Agriculture. A genuine danger existed that a large section of the farm population would be reduced to pauperism. The extent of this danger is brought home when it is realized that one-half of all persons in the United States live on a farm or in a community dependent on the agricultural production unit for its support.

[5] "For nearly a decade prior to 1932, the farmers had kept Congress in hot water almost continuously * * *. Farmer demonstrations of the preceding years had given the political leaders of both parties a realization that without the farmer vote defeat was not alone possible, but likely * * *. It was now necessary ('now' meaning 1932) to go farther in connection with campaign promises than mere reiteration of platitudes and platform phrases—farther than had formerly been recognized as needful. The farm pressure had been felt. We are told by doctors of medicine that physical pain is usually the result of pressure. That the political pressure of farmer origin was the cause of much acute political pain is true beyond all doubt * * *." Hibbard, Legislative Pressure Groups Among Farmers, 179 Annals of American Academy of Politi-

ments and to declare a complete moratorium on the payment of mortgage indebtedness.[6] The Federal Government in 1933 passed three measures designed to improve the farmers' financial situation.[7] The Agricultural Adjustment Act[8] sought to restore purchasing power by raising the level of farm prices; the Farming Mortgage Act[9] was enacted to improve farm credit through the refinance of mortgage indebtedness; and Section 75[10] of the Bankruptcy Act was intended to provide relief via composition and extension agreements to distressed farmer-debtors whose affairs did not warrant or require liquidation. These measures however proved inadequate for the task of rescuing the farmer from his financial plight. The cumbersome machinery of Section 75 was rarely resorted to because of two outstanding defects in its procedure.[11] Since the mortgage debt of most farmers represented a majority of their indebtedness, the requirement that a composition or extension be agreed to by a majority in number and amount of all creditors often tended to grant to a single mortgage a veto power over composition and extension proposals. A mere composition or extension without any reduction in the amount of the lien was not a sufficiently effective remedy, particularly in view of the fact that in the absence of consent by at least a majority of the secured creditors, there was nothing to prevent foreclosure and dispossession of the farmer.[12]

So finally a complete departure from the concept that bankruptcy legislation should preserve and distribute the debtors' assets for the creditors' benefit was resorted to. The Frazier-Lemke Act was designed solely to keep the farmer-debtor in possession of his farm perhaps for the general benefit of the state, but at any rate at the expense of his creditors.[13] After an unsuccessful attempt,[14] a constitutional act was passed as an amendment (subsection s) to Section 75 of the Bankruptcy Act.[15] Section 75 was originally to run only until March 4, 1938, but was extended to petitions filed prior to March 4, 1940[16] and re-extended to March 4, 1944.[17]

The debtor now before us filed a petition under Subsection s of Section 75 and on

---

cal and Social Science 17, 20–21. See also Capper, The Agricultural Bloc; Kile, The Farm Bureau Movement.

[6] Nevada and Wisconsin extended the period of redemption. Deficiency judgments were prohibited in Arizona, Arkansas, Idaho and Wisconsin. Moratoria declared in Arkansas, California, Iowa, Montana, Nebraska, North Dakota, Oklahoma and Texas. State measures for the Relief of Agricultural Indebtedness, Bibliography No. 45, Bureau of Agricultural Economics, U. S. Department of Agriculture.

[7] Clark, The Internal Debts of the United States (1933) 47.

[8] 7 U.S.C.A. § 601 et seq. (1933).

[9] Farm Credit Administration, 12 U. S.C.A. § 636 et seq.

[10] 11 U.S.C.A. § 203. It is interesting to note that at approximately the same time Canada passed an act with the same general purpose and application. The Farmers Creditors Arrangement Act, 1934, Chapter 53 of Acts of 1934. See McLeod, The Farmers Creditor Arrangement Act, 2 Alberta Law Journal 167; McLaws, The Farmers Creditor Arrangement Act, 2 Alberta Law Journal 239.

[11] In its first two years of operation less than one per cent of the nation's farmers took advantage of § 75. Hearings before the Subcommittee on Bankruptcy of the House Judiciary Committee on S. 2215 and H. R. 6452, p. 46.

[12] See Constitutionality of the Frazier-Lemke Act, 44 Yale Law Journal 651, 652-3.

[13] John Hancock Mutual Life Insurance Co. v. Bartels, 308 U.S. 180, 60 S. Ct. 221, 84 L.Ed. 176; Borchard v. California Bank, 310 U.S. 311, 60 S.Ct. 957, 84 L.Ed. 1222. See Weinstein, Shall Section 75 Be Made Permanent?, 12 Journal of Association of Referees in Bankruptcy 73.

[14] 11 U.S.C.A. § 203, sub. s (1934) declared unconstitutional in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

[15] 11 U.S.C.A. § 203, sub. s. The mechanism of the procedure is set forth in Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 458–461, 57 S.Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455 and John Hancock Mut. Life Insurance Co. v. Bartels, 308 U.S. 180, 185–187, 60 S.Ct. 221, 84 L.Ed. 176. See also Bernards v. Johnson, 314 U.S. 19, 62 S.Ct. 30, 86 L.Ed. ——.

[16] Act of March 4, 1938, § 1, 11 U.S. C.A. § 203, sub. c.

[17] Act of March 4, 1940, § 1, 11 U.S. C.A. § 203, sub. c.

July 21, 1937 was adjudicated a bankrupt.[18] Some time after the close of the three year moratorium period (April 12, 1941), a mortgage-creditor presented a petition for the appointment of a trustee. Testimony on this petition was taken before a Conciliation Commissioner. The latter found that the debtor was not a farmer [19] when he instituted the proceedings and accordingly recommended that the proceeding should be dismissed. To this report the debtor excepted and demanded a reappraisal of his property. Upon the confirmation of the Commissioner's report [20] by the District Judge, a dismissal of the proceedings followed.

If the detailed background of the passage of the Frazier-Lemke Act proves any one point, it demonstrates that the Act was intended for the relief of farmers only and only those who come within the statutory definition of farmer may participate in its benefits. The necessity that a debtor be a farmer, therefore, is jurisdictional.[21] Like all matters going to the jurisdiction over the subject matter, it may be raised at any point in the proceedings and by either the parties themselves or the court, sua sponte.[22] With but a dictum contra,[23] the cases are unanimous in holding that even though the court approves a petition as validly filed, it may later and of its own motion dismiss when the debtor is found not to be a farmer.[24]

It is essential, however, that jurisdictional issues under Section 75, sub.

---

[18] A motion was made by a creditor to terminate an injunction against mortgage foreclosure of the debtor's California property. The court granted the motion, but limited its decision to the California property, saying, "The good faith of Mc-Grew's petition is attacked on the ground that his schedules filed failed to disclose that he owns any farm property. * * * While this objection based on the schedules and inventory presents some ground on which to rest an objection that Mc-Grew was not in fact a bona fide farmer, we do not need to pass judgment on that, so far as the California property is concerned, for we are of the opinion that the second ground of objection is well taken, and that there is no substantial equity in the California property over the bank's indebtedness and the delinquent taxes on this property." In re McGrew, D.C., 23 F.Supp. 159, 160.

[19] "For the purposes of this section * * * the term 'farmer' includes not only an individual who is primarily bona fide personally engaged in producing products of the soil, but also any individual who is primarily bona fide personally engaged in dairy farming, the production of poultry or livestock, or the production of poultry products or livestock products in their unmanufactured state, or the principal part of whose income is derived from any one or more of the foregoing operations, and includes the personal representative of a deceased farmer * * *." 11 U.S.C.A. § 203, sub. r.

The statutory history of this definition is discussed in Benitez v. Bank of Nova Scotia, 1 Cir., 109 F.2d 743, 748–751. See also Collier on Bankruptcy (14th ed.) pp. 601–615; 10 Remington on Bankruptcy § 5010; Bankruptcy Act § 75,

99 A.L.R. 1387; What Constitutes a Farmer Under the Bankruptcy Act, 2 Ohio State Law Journal 282; Interpretation of The Term "Farmer", 4 Ohio State Law Journal 347; The Farmer and the Bankruptcy Laws, 44 Dickinson Law Review 122; Bankruptcy—Who are Farmers Under the Involuntary Bankruptcy Exemption and Debtor-Relief Statutes, 15 Oregon Law Review 62; Bankruptcy—Exemption of Farmers from Involuntary Proceedings Under the Chandler Act, 18 Oregon Law Review 108; Letzler, Bankruptcy Reorganizations For Farmers, 40 Columbia Law Review 1133, 1138 et seq.; Bankruptcy: What Section Governs Eligibility To Farmers' Compositions, 26 Cornell Law Quarterly 308.

[20] Appendix to Appellant's brief, p. 45.

[21] See 10 Remington on Bankruptcy § 4060; Diamond and Letzler, The New Frazier-Lemke Act: A Study, 37 Columbia Law Review 1092, 1097, footnote 33.

[22] McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 184, 56 S.Ct. 780, 80 L.Ed. 1135; KVOS, Inc., v. Associated Press, 299 U.S. 269, 277, 57 S. Ct. 197, 81 L.Ed. 183.

[23] In re Prudhomme, D.C., 24 F.Supp. 155.

[24] Davis v. Shackleford, 8 Cir., 91 F. 2d 148; Benitez v. Bank of Nova Scotia, 1 Cir., 109 F.2d 743; In re Iden, D.C., 35 F.Supp. 1020, affirmed Iden v. New York Ins. Co., 116 F.2d 277. See also Rudy v. Fed. Land Bank, 3 Cir., 91 F.2d 549; Beamesderfer v. First Natl. Bank & Trust Co., 3 Cir., 91 F.2d 491; In re Peterson, D.C., 8 F.Supp. 86; In re Knauft, D.C., 10 F.Supp. 785; In re Pervier, D.C., 27 F.Supp. 734.

s may not be disposed of until a hearing thereupon has been held after due notice to the debtor.[25] To make the notice due it should have included within its terms the question of farmer vel non. This it did not do but rather postulated the question of whether a trustee should be appointed. This defect was cured by the proceedings in the District Court. In those hearings the debtor expressly excepted[26] to a finding of fact[27] by the Conciliation Commissioner which was worded as follows:

"The Commissioner makes the following Finding of Fact

"1. That the debtor was not a bona fide farmer when he instituted these proceedings, in that he did not derive his principal source of income from farming, nor was he primarily engaged in farming." Appellant's Appendix p. 31. The learned District Judge at the hearing before him made an independent finding saying: "In our opinion, McGrew was not a farmer, as defined by Section 75 of the Bankruptcy Act." Appellant's Appendix, p. 48.

We must therefore affirm his dismissal of the proceedings. Since the court had no jurisdiction of the debtor, it may not order a reappraisal.

The order of the District Court confirming the Conciliation Commissioner's report is affirmed.

JONES, Circuit Judge, concurs in the result.

---

[25] Davis v. Shackleford, 8 Cir., 91 F. 2d 148; Sheets v. Livy, 4 Cir., 97 F.2d 674; Benitez v. Bank of Nova Scotia, 1 Cir., 109 F.2d 743; In re Storey, D.C., 9 F.Supp. 858. Cf. In re Harris, 9 Cir., 78 F.2d 849.

[26] Appellant's Appendix p. 32.

[27] The testimony in support of that finding was certainly overwhelming:

"Q. In 1937 when you filed this petition how much of this 13 acres did you have in sweet corn? A. I don't know. I think I planted some other crops.
* * * * *
"Q. What crops did you have on that 13 acres in 1937? Did you have corn, wheat, oats, alfalfa, or did you have tomatoes, or beans, or turnips, or what? A. I don't know exactly what I had that year. * * *
"Q. In 1937? A. I don't know in 1937.

"Q. About 1938—how about 1938? A. There was one year—1939—I raised a big crop of oats on the 13 acres.

"Q. How big a crop? Was it 50 bushel to the acre? A. I don't know; I didn't get as much out of it as I put in. I think I only got $125 out of the crop.
* * * * *
"Q. What percentage of your income did you make from this farm in 1937? A. I didn't make a very big percentage of my income in 1937.

"Q. What percentage, was it one-third, or one-tenth? A. I guess it wasn't more than 10%.
* * * * *
"Q. How much of your time did you devote to farming at the time you made 10% of your income? A. I can't answer that. I don't know." Appellees' Appendix pp. 31, 32.