**In re Morris Dale LYON and Dolores Rose Lyon, Debtors.**

**Bankruptcy No. 87–12255–12.**

United States Bankruptcy Court,
D. Kansas.

Oct. 8, 1993.

Steven L. Speth of Stinson, Lasswell & Wilson, Wichita, KS, for debtors.

James L. Bush of Windscheffel & Bush, Chartered, Smith Center, KS, for First Nat. Bank of Smith Center, Kan.

Edward J. Nazar, Redmond, Redmond & Nazar, Wichita, KS, Chapter 12 Standing Trustee.

Carol Park Wood, Wichita, KS, U.S. Trustee.

## MEMORANDUM OPINION

JOHN T. FLANNAGAN, Bankruptcy Judge.

First National Bank of Smith Center, Kansas ("FNB" or the "Bank"), objects to debtors' Notice of Completion of Plan and Request for Entry of Discharge Order. The briefs show that the parties agree that the discharge requested in this case and provided for in 11 U.S.C. § 1228(a) does not include a discharge for payments under 11 U.S.C. § 1222(b)(9). For the reasons set out below, the Bank's objection is overruled; the debtors' discharge is granted to the extent indicated; and the Bank's claim to cross-collateralization and for additional collateral at discharge is denied.

The debtors, Morris Dale Lyon and Dolores Rose Lyon, appear by their attorney, Steven L. Speth of Stinson, Lasswell & Wilson, Wichita, Kansas; First National Bank of Smith Center, Kansas, appears by its attorney, James L. Bush of Windscheffel & Bush, Chartered, Smith Center, Kansas. Edward J. Nazar, the Chapter 12 Standing Trustee, and Carol Park Wood, the United States Trustee, also appear.

The Court finds that this proceeding is core under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984.

This case requires a comparison of notes held by FNB with the treatment of them given in the Chapter 12 plan and confirmation order.

### The Notes

Before the debtors filed their Chapter 12 petition, the Bank held the following four notes secured by the stated collateral:

*Note # 1* dated September 17, 1985, was in the principal amount of $121,500.00 and was secured by *equipment.*

*Note # 2* is described in the Bank's memorandum in support of the objection to discharge as follows:

[A]lthough "each note had its own security", the note dated March 31, 1987, and referred to throughout these proceedings as Note # 2, in the principal sum of $79,500.00 was cross collateralized inasmuch as the note referred to the *Security Agreement dated December 30, 1986.* Under the terms of such notes and security agreements, the Bank had a perfected security interest in inventory, *equipment,* farm products, accounts and other rights to payment, general intangibles, government program payments, *cattle,* crops growing or to be grown, feed, grain products, silage, cane, alfalfa hay and milo. (Emphasis added.)

(Memorandum of The First National Bank of Smith Center, Kansas, In Support of Its Objection to Discharge filed April 3, 1990, at 2.)

*Note # 3* is described in the Bank's memorandum in support of the objection to discharge as follows:

The promissory note dated January 14, 1987, and referred to throughout these proceedings as Note # 3, in the principal sum of $159,000.00 was secured under the terms of *security agreements dated* December 13, 1985, *December 30, 1986* and January 14, 1987. Under the terms of such note and security agreements, The First National Bank of Smith Center, Kansas, had a perfected security interest in all inventory, *equipment,* farm products, accounts and other rights to payment, general intangibles, *cattle,* growing crops or crops to be planted, feed, seed, fertilizer, silage, alfalfa, hay and all other personal property owned by Debtors.

(Memorandum of The First National Bank of Smith Center, Kansas, In Support of Its Objection to Discharge filed April 3, 1990, at 2.)

*Note # 4* dated September 17, 1985, in the principal amount of $190,000 was secured by *real estate.*

### The Chapter 12 Plans

The debtors filed their voluntary petition for relief under Chapter 12 on August 18, 1987.

On August 24, 1987, they filed their Chapter 12 plan. They then filed their First Amended Chapter 12 Plan and their Second Amended Chapter 12 Plan on September 29, 1987, and November 10, 1987, respectively. All three of debtors' proposed Chapter 12 plans provide at numbered paragraph 3:

Except as hereafter specified in the Plan, confirmation of this Plan shall vest in the Debtors title to all assets of the Debtors' estate, free and clear of all liens and encumbrances.

The Bank filed a series of objections to confirmation of the debtors' plans, one of which resulted in denial of confirmation of debtors' plan.

This objection argued non-compliance with § 1225(a)(4), a Code provision commonly known as the "best interests of creditors test." Under this confirmation standard, a Chapter 12 plan cannot be confirmed unless the property to be distributed to unsecured claims under the plan is at least as valuable as that property which the unsecured claims would receive if the estate were liquidated under Chapter 7 on the effective date of the plan.

The objection was presented to The Honorable John K. Pearson at a hearing on September 29, 1987. In a Memorandum of Decision filed October 21, 1987, he sustained the objection, holding:

The value as of the effective date of the Plan of the property which could be distributed on account of allowed unsecured claims is *less* than the amount which would be paid on account of such claims if the debtors were to be liquidated under Chapter 7 of Title 11.

(Memorandum of Decision filed October 21, 1987, at 5.)

On pages 4 and 5 of his Memorandum of Decision, Judge Pearson sets out his findings of value as follows:

|   |   |   |
|---|---|---|
| i. | Land equity (after deducting FLB and FmHA debt) | $ 74,516.00 |
| ii. | Equipment | 102,900.00 |
| iii. | Cattle | 199,125.00 |
| iv. | 1986 and 1987 Government payments | 23,605.00 |
| v. | Growing crops (milo and sunflowers) | 14,225.00 |
| vi. | Wheat in storage | 8,360.00 |
| vii. | Feed on hand | 2,000.00 |
|   | TOTAL | $424,731.00 |

*The Agreed Confirmation Order*

Ultimately, the parties reached an accommodation and the Court entered an agreed Order of Confirmation on December 1, 1987. The Bank's counsel signed the order, consenting for the Bank.

Paragraph 7 of the Confirmation Order addresses vesting of property, retention of liens, and unencumbered assets. It duplicates the plan provisions set out above:

> That pursuant to the provisions of 11 U.S.C. Section 1227, this Order vests all of the property of the estate in the Debtor with the exception that any lien as determined for each allowed secured claim, of such secured creditor, shall be retained. That all other unsecured assets of the Debtor shall be free and clear of any claim or interest of any creditor provided for by the Plan.

(Order of Confirmation of Debtors' Plan of Reorganization Under Chapter 12 filed December 1, 1987, at 10.)

The terms of the confirmation order, modified by additions of emphasis, deletions of irrelevant material, and insertions of paragraphing to aid the reader, are as follows:

> *CLASS III—The First National Bank of Smith Center—*
>
> The Debtors have four separate notes with this creditor, each having its own security with three being fully secured and one undersecured.
>
> As a result of the Court's decision filed October 21, 1987, the note to The First National Bank of Smith Center (FNB) on its equipment is fully secured. The indebtedness to the bank is $97,786.08 and will be paid over 7 years at an interest rate to be equal to one percent below the 52–week Treasury Bill rate. . . .
>
> The Debtors have two lines of credit with the bank.
>
> The first is in the amount of $159,000 and is secured by the Debtors' *cattle.*
>
> The second is in the amount of $79,500 and is secured by the Debtors' *crops, cattle and 1987 government payments.*
>
> These two notes total $238,500 and the Debtors will pay the full value of this claim amortized over 10 years with interest to be set at the 52–week Treasury Bill rate, plus 3 percent. . . . *The creditors will retain their lien in the Debtors' crops, cattle and government payments, and the proceeds therefrom.* The Debtors will be allowed to use the proceeds of this collateral to fund the Plan with the bank to receive a replacement lien in the crops, cattle and government payment of succeeding years, until paid in full.
>
> The fourth note with the FNB brings the total debt to the bank to $547,958.33 with the West Half of the Northwest Quarter (W/2 NW/4) of Section Nine (9), Township Two (2) South, Range Fourteen (14) West of the Sixth P.M. being held as security on the fourth note. *As the only unsecured or undersecured creditor, the FNB will have applied towards this note all of the Debtors' equity and value of unsecured assets.*
>
> Said equity totals $120,000 which will be paid to the bank amortized over 30 years, which is the current payout on this particular note, with the interest rate to be set at the 52–week Treasury Bill rate, plus 3 percent. . . . *The bank will retain its first mortgage position with respect to the referenced real property, its third mortgage position with respect to all other real property and the same security position it now has with respect to the Debtors' other personal property.*
>
> The preceding paragraphs result in single annual payments to the FNB of $68,-492.31. . . .
>
> For all years during which the Debtors have any indebtedness at the First National Bank of Smith Center, the Debtors will provide, upon request of the bank, current financial statement, income tax returns for the previous year and will permit regular collateral inspections.

(Order of Confirmation of Debtors' Plan of Reorganization Under Chapter 12 filed December 1, 1987, at 5–8.)

*The Discharge Request and Objection*

Time passed with debtors performing under the plan until January 16, 1990, when they filed their Notice of Completion of Plan

and Request for Entry of Discharge Order. The Notice of Completion sets out the following comparison of collateral values between the time of confirmation and discharge:

|     |                   | CONFIRMATION | DISCHARGE   |
| --- | ----------------- | ------------ | ----------- |
| a.  | Land              | $509,260.00  | $509,268.00 |
| b.  | Machinery         | 102,900.00   | 55,700.00   |
| c.  | Cattle            | 199,125.00   | 81,255.00   |
| d.  | Government payments | 23,605.00  | 11,750.00   |
| e.  | Stored crops & feed | 10,360.00  | 31,300.00   |
| f.  | FLB stock         | 10,950.00    | 1,000.00    |
| g.  | Athol Co–Op       | 6,400.00     | 15,780.00   |
| h.  | Growing crops     | 14,225.00    | 18,100.00   |
| i.  | Cash & receivables | 4,500.00    | 37,342.00   |
|     | Total Assets      | $881,333.00  | $761,495.00 |

(Notice of Completion of Plan and Request for Entry of Discharge Order filed January 16, 1990, at 4.)

The Standing Trustee's Statement was filed on February 22, 1990. Both the Trustee's Statement and the Notice of Completion of Plan and Request for Entry of Discharge Order state that all plan payments, except those payments being made pursuant to 11 U.S.C. § 1222(b)(5) and/or (b)(9), have been made and distributed and that there are no further plan payments to be made.

The Bank filed an Objection to Discharge of the Debtors on February 7, 1990. Debtors responded with a memorandum setting out a Statement of Facts in numbered paragraphs. In its brief, the Bank agreed with paragraphs 1 through 3 of the debtors' statement and had this to say in response to paragraph 4:

Bank concurs with Paragraph 4 of Debtors' Statement of Facts, but further advises the Court that although "each note had its own security", the note dated March 31, 1987, and referred to throughout these proceedings as Note # 2, in the principal sum of $79,500.00 was cross collateralized inasmuch as the note referred to the *Security Agreement dated December 30, 1986.* Under the terms of such notes and security agreements, the Bank had a perfected security interest in inventory, equipment, farm products, accounts and other rights to payment, general intangibles, government program payments, cattle, crops growing or to be grown, feed, grain prod-

ucts, silage, cane, alfalfa hay and milo. The promissory note dated January 14, 1987, and referred to throughout these proceedings as Note # 3, in the principal sum of $159,000.00 was secured under the terms of security agreements dated December 13, 1985, *December 30, 1986* and January 14, 1987. Under the terms of such note and security agreements, The First National Bank of Smith Center, Kansas, had a perfected security interest in all inventory, equipment, farm products, accounts and other rights to payment, general intangibles, cattle, growing crops or crops to be planted, feed, seed, fertilizer, silage, alfalfa, hay and all other personal property owned by Debtors. (Emphasis added.)

(Memorandum of the First National Bank of Smith Center, Kansas, in Support of its Objection to Discharge filed April 3, 1990, at 2.)

With this statement, the Bank complains that its pre-petition cross-collateralized position should be recognized under the confirmed plan. Another expression of the Bank's position appears in its brief:

From the Security agreements attached to Bank's claim, the obligations due and owing on Notes # 2 (Exhibit B [attached to the Bank's brief] ) and # 3 (Exhibit C [attached to the Bank's brief] ) were undoubtedly cross-collateralized. Had there been a pre-petition liquidation of equipment, following satisfaction of obligations owing under Note # 1, secured only by equipment, excess revenues would be paid on Notes

#2 or #3. Likewise, if there had been a pre-petition liquidation of livestock or farm products, that [sic] any revenues exceeding balances owing on Note #2 could be applied to Note #3, and vice versa.

(Memorandum of the First National Bank of Smith Center, Kansas, in Support of its Objection to Discharge filed April 3, 1990, at 5–6.)

When the Bank uses the term "cross collateralized," it refers to its rights under the pre-petition notes and security documents. Note #1 is secured by equipment. Notes #2 and #3 both refer, *inter alia,* to a security agreement dated December 30, 1986. Under that security agreement, Notes #2 and #3 are secured by equipment, cattle, crops, farm products, accounts and contract rights. In addition, Note #3's security includes government payments. Note #4 is secured only by real estate.

A comparison of the Bank's collateral position under the agreed confirmation order with that under its pre-petition notes and security agreements reflects a change in collateral. In the confirmation order, Note #1 is expressly secured only by equipment. In describing the collateral for Notes #2 and #3, the confirmation order leaves out the reference to the security agreement of December 30, 1986, found in the pre-petition notes. According to the confirmation order, these two notes are collateralized only by crops, cattle, and government payments. No mention is made in the confirmation order of equipment being collateral under either of these notes, although that was the case under the pre-petition notes. Note #4 is secured by real estate only.

### Confirmation Law

■ Section 1222 of the Code spells out the permissible contents of a Chapter 12 plan. Subsection (b)(2) thereof allows the plan to "modify the rights of holders of secured claims." However, the scope of this right to modify secured claims is limited by

§ 1225 which establishes the standards for confirmation of a plan. Under § 1225(a)(5), the court can confirm a plan that affects secured claims if the holder of such a claim accepts the plan or the debtor surrenders the property securing such claim to the secured claim holder. If neither of these conditions prevail, the court may still confirm a plan that modifies the rights of a secured claim holder if the plan provides that the secured claim holder will retain the lien securing his claim and that the debtor will distribute to the secured claim holder property having a value, at the effective date of the plan, not less than the allowed amount of the secured claim. Absent consent by the secured claim holder, this provision marks the outside limit of the plan's ability to modify a secured claim as allowed by § 1222(b)(2).[1]

Section 1227 states that after confirmation, the plan provisions bind the Bank whether it has objected to, has accepted, or has rejected the plan. The provisions of § 1227(a) are repeated in the confirmed plan. Here, the Bank agreed to the confirmation order. For that reason and because the plan conforms to § 1225(a)(5)(B), the Bank is bound by the terms of the confirmed plan and the confirmation order.

### The Plan Does Not Provide for Cross–Collateralization

■ The Bank argues that the language of the plan and the Order of Confirmation provide that the cross-collateralization in effect pre-petition under the notes should continue post-petition. The debtors' Chapter 12 Plan, First Amended Chapter 12 Plan, and Second Amended Chapter 12 Plan each specifically set out that the debtors had "four separate notes with this creditor [First National Bank of Smith Center], each having its own security. . . ." (Paragraph captioned "Class III": Debtors' Chapter 12 Plan Filed August 24, 1987, at 3; Debtors' First Amended Chapter 12 Plan filed September 29, 1987, at 4; Debt-

---

**1.** Actually, if the secured claim antedates the enactment of the Bankruptcy Code, there is another limit to the plan's ability to modify the secured claim, a constitutional one. *See Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). But, in this case the notes show that all of the liens were created after 1978 so there is no vested rights problem.

ors' Second Amended Chapter 12 Plan filed November 10, 1987, at 4.)

The order confirming the plan, which was agreed to by counsel for the Bank, provides that the $159,000.00 note, Note # 2, is secured by the debtors' cattle. The order also provides that the $79,500.00 note, Note # 3, is secured by the debtors' crops, cattle, and 1987 government payments. The confirmation order combines the balance of Notes # 2 and # 3 and states that the total due under these two notes is $238,500.00. The confirmation order provides: "... [T]he Debtors will pay the full value of this claim [the total amount due under Notes # 2 and # 3] amortized over 10 years with interest ... which will result in payments on these two notes of $38,531.76 per annum, commencing December 30, 1987." (Order of Confirmation of Debtors' Plan of Reorganization Under Chapter 12 filed December 1, 1987, at 6–7.)

The Order of Confirmation also provides for specific annual payments on Note # 1, the equipment note, for a period of seven years and on Note # 4, the real estate note, for a period of thirty years.

The Bank points specifically to a provision in the debtors' plan providing that secured creditors would retain their pre-petition priority as evidence that cross-collateralization of its claims was granted by the plan. The entire text of the sentence upon which the Bank relies states: "The bank will retain its first mortgage position with respect to the referenced real property, its third mortgage position with respect to all other real property and the same security position it now has with respect to the Debtors' other personal property." (Debtors' Second Amended Chapter 12 Plan filed November 10, 1987, at 6–7.)

The Court finds that the phrase "same security position" was not intended to grant the Bank a cross-collateralization of its claims. Taken in the context of the sentence in which it is used, this statement is intended to clarify that the Bank will continue to hold the same priority among the debtors' other secured creditors as it had occupied prior to bankruptcy.

The plan provisions regarding the Bank's claims, as contained in each of the three plans filed by the debtors, are devoid of any reference to a pre-petition cross-collateraliza-

tion provision in any of the notes. The plan itself makes no specific statement granting or continuing a cross-collateralization provision. To hold that this phrase regarding retention of the Bank's priority status among other creditors acts to create or continue a cross-collateralization provision would be inconsistent with the language of the Second Amended Plan and the Order of Confirmation.

### *The Confirmation Order Does Not Grant Cross-Collateralization*

Next, the Bank argues that Judge Pearson's order of October 21, 1987, sustaining the Bank's objection to the debtors' plan because the debtors failed to meet the "best interest of creditors" test indicates that the Bank's claims were to be cross-collateralized.

▆ The Bank cites the following portion of the order as showing that Judge Pearson intended that the Bank's notes be cross-collateralized:

The value as of the effective date of the Plan of the property which could be distributed on account of allowed unsecured claims is *less* than the amount which would be paid on account of such claims if the debtors were to be liquidated under Chapter 7 of Title 11.

(Memorandum of Decision filed October 21, 1987, at 5.)

This finding does not support the Bank's conclusion that Judge Pearson intended that the debtors grant the Bank cross-collateralization. This finding merely reflects the statutory requirement found in 11 U.S.C. § 1225(a)(4) and indicates that the debtors' proposed plan failed to meet this requirement. The language of this section certainly does not give unsecured creditors a lien in a debtor's unencumbered, non-exempt assets and there is no reason to believe that Congress intended that unsecured creditors would receive such an extraordinary benefit.

The Second Amended Plan provides that the Bank, the only unsecured or undersecured claimant in the case, would be paid the entire liquidation value over a period of 30 years. The Order of Confirmation therefore

states, "As the only unsecured or undersecured creditor, the FNB will have applied towards this note [the Bank's undersecured note] all of the debtors' equity and value of unsecured assets." (Order of Confirmation of Debtors' Plan of Reorganization Under Chapter 12 filed December 1, 1987, at 7.) The Bank suggests that this statement shows that the parties intended the Bank to be cross-collateralized.

However, the Court is unable to find any relationship between this statement and an intent by the parties that the Bank's claims be cross-collateralized. The plan does not provide that the Bank, as an unsecured creditor, is entitled to receive a lien on the debtors' unsecured, non-exempt assets, the value of which is being paid out under the liquidation test. Nor does the Code require a debtor to grant an unsecured creditor a lien on unencumbered, non-exempt assets. In fact, such a requirement would contradict the "fresh start" policy of the Code and in this case, if not in most cases, effectively prevent a successful reorganization.

The cross-collateralization argument surfaced for the first time in the Bank's Memorandum in Support of Objection to Discharge filed on April 3, 1990. The Court finds it quite unpersuasive that the Bank intended to create or retain such a substantial right, yet let years go by without ever making the argument to the Court.

### A Secured Creditor Is Not Entitled to Maintain Security Values

 Finally, the Bank argues that a creditor who believes it is in a worse collateral position at the time of discharge than it was at the time of confirmation is entitled to additional security, including a cross-collateralization of its claims. However, the Bank fails to provide the Court with any statute or case law to support this proposition.

■ The Court's research has been unable to find any support for such a request. The secured status of a creditor at the time of discharge is irrelevant to a debtor's entitlement to a discharge. Section 1228 sets out the procedure and criteria for discharge in a Chapter 12 case. Nowhere in that section or any other section of the Code is there any indication that a creditor may reevaluate its secured position at discharge and receive additional security upon its determination that it is in a less secure position than it was at confirmation. As with the Bank's previous argument, this procedure would be contrary to the language and intent of the Code.

### Conclusion

Accordingly, the Bank's objection to the debtors' request for discharge is overruled. Additionally, the Bank's request for granting of a cross-collateralization of its security interest is denied. The debtors are directed to submit a proposed Discharge Order consistent with this opinion.

This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.